COMMON CAUSE, et al., Plaintiffs,

v.

William F. BOLGER, et al., Defendants,

and

House Commission on Congressional
Mailing Standards, Intervening
Defendant.

Civ. A. No. 1887–73.

United States District Court,
District of Columbia.

Sept. 7, 1982.

Kenneth Guido, Jr., Common Cause, Washington, D.C., for plaintiffs.

John McClay, Dept. of Justice, Washington, D.C., for defendants.

John Vanderstar, Covington & Burling, Washington, D.C., for House Comm. on Mailing Stand.

Michael Davidson and Elizabeth Culbreth, Washington, D.C., for U.S. Senate.

Before WILKEY, Circuit Judge, and GEORGE L. HART and JOHN H. PRATT, District Judges.

JOHN H. PRATT, District Judge.

## MEMORANDUM OPINION

### STATEMENT OF THE CASE

By an amended complaint filed March 12, 1974, plaintiffs seek a declaratory judgment that 39 U.S.C. § 3210, granting to Members of Congress the privilege of sending mail through the United States Postal Service as franked mail, is unconstitutional. Plaintiffs claim, in essence, that the franking privilege afforded by the statute provides an unconstitutional "subsidy" to incumbent candidates for Congress because franked mail inevitably has the effect of aiding Members' reelection efforts. Plaintiffs reason that because they are not afforded similar campaign advantages, section 3210 abridges their First Amendment rights to associate freely for the advancement of political beliefs, as well as deprives them of equal protection under the due process clause of the Fifth Amendment. In addition, plaintiffs seek a judgment that section 3210 permits an unlawful use of public funds for a non-public purpose in violation of the General Welfare Clause of Article I, Section 8, of the Constitution.

The Postmaster General and the Secretary of the Treasury were the original named defendants in this case. Subsequently, on September 8, 1976, the House Commission on Congressional Mailing Standards was permitted to intervene as a defendant and the United States Senate, through its Select Committee on Ethics, formerly the Select Committee on Standards and Conduct of the United States Senate, was allowed to participate as *amicus curiae*.

It is the position of all defendants and the *amicus* that the franking statute and the congressional rules enacted thereunder facilitate the necessary and constitutionally protected communication between Members of Congress and their constituents and draw a proper line between legitimate and illegitimate uses of the frank, *i.e.*, between communications on official business and communications for personal political advantage. They deny that the franking statute violates any of plaintiffs' First or Fifth Amendment rights. The case therefore presents a classic example of the tension which sometimes arises between conflicting claims of right.

### PRIOR PROCEEDINGS

On July 1, 1974, after denying defendants' motion to dismiss, the court granted plaintiffs' motion to convene a statutory court of three judges pursuant to 28 U.S.C. § 2284.[1] This court, in turn, considered and denied defendants' renewed motion to dismiss on February 10, 1975. Both motions to dismiss were predicated in part on plaintiffs' alleged lack of standing to bring this action, and were denied. Thereafter, all parties engaged in discovery through interrogatories, documentary requests, depositions and requests for admissions. Because of the nature of much of the material, a protective order was issued on March 1, 1976 and various coding systems were established to protect the confidentiality of Members of Congress and other witnesses. Without detailing the precise nature and volume of the discovery pursued

---

1. Pub.L. No. 94–381, enacted August 12, 1976, which repealed §§ 2281 and 2282 and amended

§ 2284, does not apply to any actions filed before the date of enactment.

by both sides, it is fair to say that the discovery concluded on April 22, 1981 has been thorough and complete. Many of the basic facts are not in dispute; what is sharply contested are the inferences to be drawn therefrom.

PRESENT POSTURE

Pursuant to the Court's timetable, plaintiffs, defendants and the intervening defendant filed motions for summary judgment on May 22, 1981. Oppositions were filed by the parties on June 12, 1981, as well as a memorandum of the United States Senate in support of the motions of defendants and intervening defendant and in opposition to plaintiffs' motion for summary judgment. The matter was argued at length on September 30, 1981.

STATUTORY BASIS FOR THE FRANKING PRIVILEGE

*1. The History of the Frank*

■ The origin of the franking privilege can be traced to 17th Century England, when the privilege was granted to Members of the House of Commons concurrent with the establishment of the first public postal service in that country. The clear purpose then, as it is today, was to facilitate the carrying on of official business.

In 1775, the Continental Congress authorized the use of the frank by its own members and by those on active duty in the Continental Army. The First Congress, when it acted to establish a postal system in 1789, retained the privilege for official correspondence and documents. In 1873, after the Civil War, the privilege was temporarily abolished by Congress, but was restored in *proprio vigore* in 1895. 28 Stat. 601, 622 (Sec. 85).

Until the comprehensive revision of 1973, the Act of 1895 authorized Members of Congress to use the frank for correspondence on "official business." The responsibility to interpret the meaning of the term "official business" was exercised by the

Post Office Department, which, upon request of anyone, including members of the public, provided official guidance in the form of advisory opinions as to whether a mailing or contemplated mailing could be franked.

This procedure was changed in 1968 when, in recognition of the practical as well as possible constitutional problems of its advisory position, the Department decided to give up its practice of issuing opinions to members of the public. It did, however, continue to give advisory opinions to Members of Congress until 1971, when, with the establishment of the new Postal Service, the Post Office Department relinquished any remaining responsibility in this area.

This confused state of affairs led to a spate of lawsuits in the federal courts of four different circuits by candidates running against incumbent members. At least two of these challenges, focused on the propriety of certain franked mailings by particular members,[2] were an acute embarrassment to Congress. Other more flagrant abuses surfaced, among them the reported event of a member mailing his lawn furniture to Bimini in the Bahamas, under a frank with the tag reading "Official Business." The combination of these factors plus the threat of further lawsuits led to Arizona Congressman Morris Udall's introduction of H.R. 3180 in early 1973. Similar proposals were introduced in the Senate, and after the differences between the two bodies were accommodated in conference, the Franking Act of 1973, Pub.L. No. 93–191, was signed by the President and became law on December 18, 1973.

*2. The 1973 Statute*

The statute is set forth primarily in 39 U.S.C. §§ 3201, 3210–19. In this litigation, our attention is focused on section 3210.

In its opening declaration of policy, the statute states that the privilege of sending

---

**2.** *Schiaffo v. Helstoski,* 492 F.2d 413, 430, n. 89 (3d Cir.1974); *Hoellen v. Annunzio,* 468 F.2d 522, 526 (7th Cir.1972) (permitting the use of extrinsic evidence in addition to content, *i.e.,* timing and other characteristics of franked

mailings, as relevant to the sender's motive and the question whether the mailings were made to further an incumbent's election rather than the conduct of his official responsibilities as a legislator).

mail under the frank is "to assist and expedite the conduct of the official business, activities, and duties of the Congress of the United States." 39 U.S.C. § 3210(a)(1). "Official business" is defined to

cover all matters which directly or indirectly pertain to the legislative process or to any congressional representative functions generally or to the functioning, working, or operating of the Congress and the performance of official duties in connection therewith, and shall include, but not be limited to, the conveying of information to the public, and the requesting of the views of the public, or the views and information of other authority of government, as a guide or a means of assistance in the performance of these functions.

39 U.S.C. § 3210(a)(2).

There follows a list of what the Congress considered to be frankable mail matter. The list includes, but is not limited to:

(a) Mailings to any person or any government official regarding programs, decisions and other matters of public concern.
§ 3210(a)(3)(A);

(b) The "usual and customary congressional newsletter or press release."
§ 3210(a)(3)(B);

(c) The "usual and customary congressional questionnaire."
§ 3210(a)(3)(C);

(d) Mail expressing condolences to a person who has suffered a loss or congratulations to a person who has achieved some personal or public distinction.
§ 3210(a)(3)(F);

(e) Mass mailings of federal documents and publications and publications containing items of general information.
§ 3210(a)(3)(G);

(f) Mail consisting of voter registration or election information or assistance.
§ 3210(a)(3)(H);

(g) Mail including a biography or autobiography of a member or family members which is part of a federal publica-

tion or in response to a specific request and not included for publicity purposes in a newsletter or other mass mailing.
§ 3210(a)(3)(I);

(h) Mail containing a picture, sketch or other likeness of a Member which is part of a federal publication or in response to a specific request, or, when contained in a newsletter or other mass mailing, is not of such size or does not occur with such frequency as to lend to the conclusion that the purpose is to advertise the Member, rather than illustrate the accompanying text.
§ 3210(a)(3)(J);

By way of contrast, the unauthorized uses of the frank are specified to cover the following: purely personal mailings unrelated to official business, § 3210(a)(4); mailings "laudatory and complimentary" of a member "on a purely personal or political basis," § 3210(a)(5)(A); "greetings" from the spouse or other members of the member's family, § 3210(a)(5)(B)(i); reports on how and when the member or his spouse or family spends time other than in connection with legislative, representative, and "other official functions," § 3210(a)(5)(B)(ii); mail "which specifically solicits political support," § 3210(a)(5)(C); and "any mass mailing ... less than 28 days immediately before the date of any primary or general election ...," § 3210(a)(5)(D).

The statute therefore permits franked mass mailings (defined to mean newsletters and similar mailings of more than 500 pieces) when they are made at least 28 days prior to a primary or general election. 39 U.S.C. § 3210(a)(5)(D). The statute also allows a member of the House to use the frank on postal patron mass mailings addressed not only into the area of his congressional district, but also into an area which he does not presently represent, but in which he will be a candidate in the next election because of redistricting. 39 U.S.C. § 3210(d)(1)(A) and (B). Accordingly, material may be mass mailed under the frank to points outside the district of a Representative or outside the state of a Senator, sub-

ject only to the 28-day restriction.[3] Materials such as newsletters and press releases printed with campaign contributions are specifically permitted to be mailed under the frank. 39 U.S.C. § 3210(e).

It is clear from the legislative history, as well as from the text of the statute, that the 1973 Act was designed to give explicit approval to the traditional uses of the frank. As Congressman Udall, the leading supporter of the legislation, stated more than once, the approved uses were intended to be a summary of present practices. He emphasized that "we are simply confirming the sound, solid, responsible use of the frank which the vast majority of Members of Congress have always followed."[4] The entire legislative history confirms the position expressed by Congressman Udall.

3. *The House Commission on Congressional Mailing Standards and the Select Committee on Standards and Conduct of the Senate (now Select Committee on Ethics)*

The 1973 statute also established for the House of Representatives a special commission composed of members and known as the "House Commission on Congressional Mailing Standards," (hereinafter House Commission) and for the Senate, the Select Committee on Standards and Conduct of the Senate (hereinafter Senate Committee). 2 U.S.C. §§ 501, 502. Both groups are required to "provide guidance, assistance, advice, and counsel, through advisory opinions or consultations, in connection with the mailing or contemplated mailing of franked mail" under the 1973 Act. 2 U.S.C. §§ 501(d), 502(a). The Act also specifically provides for an administrative procedure for the receipt, investigation and hearing of complaints concerning alleged violations of the franking statute and limits the jurisdiction of the federal courts hearing such complaints.[5] Both the House Commission and the Senate Committee are required to "prescribe regulations governing the proper use of the franking privilege." 2 U.S.C. §§ 501(d), 502(a).

Each House of Congress, in response to the statute, has enacted formal rules which set further limits on the kind of material which may be franked. House Rule XLVI;[6] Senate Rule XLVIII, renumbered as 48(3).[7] While varying in certain respects, the Rules of both branches of Congress reflect concern as to the adequacy of the 1973 Act in two important respects:

(a) They extend the prohibition on mass mailings before a primary or general election in which the Member is a candidate from the 28 days permitted under the statute to 60 days.

(b) They require that the costs of mass mailings be defrayed exclusively from appropriated funds, although the statute permits the franked mail-

---

**3.** In providing that the frankability of mail matter shall be determined "by the type and content of mail sent, or to be sent," this section also overturned the effect of *Hoellen, supra,* in which Judge (now Justice) Stevens stated that "we should not close our eyes in the face of extrinsic evidence which reveals that an appearance of official business is nothing more than a mask for a private purpose." *Hoellen, supra,* at 526.

**4.** *See, e.g.,* 119 Cong.Rec. H 2600 (Apr. 11, 1973); see also *Congressional Perquisites and Fair Ethics: the Case of the Franking Privilege,* 83 Yale L.J. 1055, 1062–74.

**5.** 2 U.S.C. §§ 501(e), 502(b), 502(c). In the case of complaints concerning House members, judicial review is on the basis of the administrative record before the House Commission § 501(e). In the case of the Senate, judicial review, while apparently *de novo,* cannot take place until after the filing of the complaint and decision thereon by the Senate Committee. § 502(c).

**6.** Adopted March 2, 1977 in H.R. 287. In addition, the House Commission on Congressional Mailing Standards, pursuant to its Rule XLVI, has issued extensive regulations governing the use of the frank and rules of practice in proceedings before the Commission. *Regulations on the Use of the Congressional Frank by Members of the House of Representatives* (February, 1979).

**7.** Adopted April 1, 1977 in S.R. 110. The Senate Select Committee on Ethics has similarly implemented its Rule XLVIII through the issuance of regulations. The latest of these are *Regulations Governing the Use of the Mailing Frank by Members and Officers of the United States Senate* (June 26, 1979).

ing of such material when paid for out of campaign funds.

### 4. *Public Law No. 97–69*

Most recently, Public Law No. 97–69, enacted on October 26, 1981, has further amended the 1973 statute by embodying the above two provisions of the House and Senate Rules as well as the prohibition barring mass mailings outside a member's district, when he is a candidate for another public office. The new law also extends the postal patron mailing privilege to the Senate and directs the Senate Committee on Rules and Administration to establish limits on such mailings.[8] Furthermore, the statutory authorization for letters of condolence and congratulations for personal distinction is eliminated and letters of congratulation can be sent only for "some public distinction."

To summarize, since this action was originally brought, the Congress has tightened considerably the respective features of the 1973 Act, particularly by incorporating into law the two important limitations embodied in the House and Senate Rules and implementing regulations and by eliminating authorization for the franking of all letters of condolence and certain letters of congratulations. The plaintiffs nevertheless remain firm in their challenge.

### THE ISSUES

It is in the context of the foregoing statutory scheme governing the use of the franking privilege that two paramount issues are presented:

1. Whether the statute, as written and implemented, deprives the plaintiffs of their right to a fair political process, in violation of their constitutional rights under the First and Fifth Amendments.

2. Whether the statute recognizes and protects the constitutional right and duty of Members of Congress to

communicate with their constituents and at the same time limits any incidental adverse effects on the political process.

### THE FACTUAL RECORD

We are convinced, after careful review of the evidentiary record[9] amassed over the length of discovery in this case, that the basic facts underlying plaintiffs' challenge are not in dispute. We, therefore, set out our findings of fact in this case for the principal purpose of providing a clear context for our discussion and decision on the differing legal and constitutional arguments made. We preface these findings with two general assumptions, neither of which is genuinely disputed.

First, it stands to reason that incumbency alone is a valuable asset to the public official who seeks reelection. An incumbent Member of Congress enjoys a certain "visibility" among his constituents that a challenger may find difficult or impossible to match. It is also beyond argument that any communication with constituents, whether through local meetings or through the mail or mass media, contributes to such visibility and thus may have a direct effect (however slight) in influencing the outcome of an election. To the extent that the effect is positive from the incumbent's standpoint, it is undoubtedly detrimental to his challenger's position. This is so whether the communication is part of an overt campaign effort or made simply in the normal course of a member's representative function.

Second, there is little doubt that the franking privilege is a valuable tool in facilitating the performance by individual Members of Congress of their constitutional duty to communicate with and inform their constituents on public matters. As noted

8. Present House Rules limit such mailings to six per year.

9. Contained in plaintiffs' voluminous Statement of Material Facts Not in Dispute incorporating plaintiffs' Request for Admissions (570 requests)

and defendants' responses thereto. The extensive response of defendant intervenor alone to plaintiffs' Request for Admissions comprises 622 pages.

earlier, it is this particular duty which has justified the frank through its history.

Plaintiffs do not argue with the necessity of or public value in some kind of Congressional franking privilege. Their challenge before this court is based only on assertions that section 3210, as it stood in 1973 and, notwithstanding increased restrictions embodied in the Rules of both Houses and in subsequent amendments, even as it stands now, is drafted to enable more than the justifiable uses—that it permits Members of Congress to use the frank to make campaign-related mailings, particularly mass mailings.[10]

On the basis of the convincing evidentiary base offered by plaintiffs to support their argument, we make the following findings and offer a sampling of supporting evidence:

1. Members of Congress and their staff have received advice from many sources to take full advantage of the franking privilege in their campaign efforts. The publication of *The Job of the Congressman,* co-authored by Congressman Morris Udall, Chairman of the House Commission on Congressional Mailing Standards and sponsor of the bill which became the Franking Act of 1973, advises members of the benefits of such use. Campaign committees from both the Republican and Democratic parties have held seminars for congressional staff members concerning the effective use of newsletters, questionnaires and other franked mailings. The Republican Senatorial Committee employed a direct mail consultant to give advice concerning effective campaign use of mass mailings—including franked mailings. A 1974 Democratic Campaign Committee manual entitled "Maximum Campaign Budget" called for integration of targeted franked mass mailings into overall campaign strategy. It is apparent that at least some members and their staffs believed that the use of

franked mailings can be politically beneficial and should be employed.

2. At least some Members of Congress used direct mail consultants during the 1972, 1974 and 1976 campaigns to build mailing lists and to help integrate franked mailings into the overall campaign strategy.

3. Several Senators and Representatives have targeted franked mass mailings in ways that frequently have no relationship to official business and which are closely connected to reelection plans and strategy. Such targeted mailings, which are identified and documented, make use of voter registration lists and may be designed to convey views on an issue to a select group which is likely to be receptive to those views. Mailings may be made to voters on the basis of demography (race, religion, sex, age), geography, political affiliation or membership in special interest groups. The importance of special interest group mailings and of targeted mass mailings is demonstrated by the fact that, during the period from 1973–75, less than two percent of franked mass mailings by Senators were general newsletters.

4. The "usual and customary congressional questionnaires," frankable under section 3210(a)(3)(C), are often used for purposes other than merely determining constituents' views on particular issues. They may be used to obtain demographic and other information helpful to identifying recipients for targeted mailings, thus facilitating the member's political "responsiveness" to various groups and interests.

5. Members often include self-laudatory material in franked mailings, including favorable editorials, reports of awards, compliments of others concerning the member's performance of his duties, pressure group ratings, and the like. They also use franked mails to compliment and honor constituents to generate good will which,

---

**10.** Plaintiffs object specifically to several types of mass mailings explicitly or implicitly permitted by the provisions of section 3210; mailings including self-laudatory material; reports concerning visits to Washington by constituents; solicitation of political support (falling short of the specific requests barred by the statute); congratulatory messages; and questionnaires.

according to plaintiffs, improves the members' chances of reelection.

6. The House Commission on Congressional Mailing Standards has specifically approved the uses of the franking privilege described above. Mailings referred to in these findings and made by Senators were registered with the Secretary of the Senate.

7. The volume and timing of franked mass mailings, revealed by data stipulated by the parties to be reasonably accurate, indicate widespread use to promote incumbents' reelection efforts. The volume of franked mass mailings is significantly higher in the year preceding House or Senate elections than in the year following elections. The volume builds to a peak just before the pre-election cutoff and drops sharply. The volume of non-mass franked mailings stays relatively constant from year to year in both the House and the Senate. It is an undeniable conclusion that the fluctuations in the volume of franked mass mailings are caused by the electoral cycle, rather than by fluctuations in legislative activity.

8. Measured in financial terms, the franking privilege confers a substantial advantage to incumbent Congressional candidates over their challengers. We find that Congress recognized the potential financial benefits conferred by section 3210 on campaigning incumbents at the time it passed the Act.

9. We make no specific finding concerning the extent to which use of the franking privilege has contributed to the electoral victories of any incumbent Members of Congress. We are inclined by the lack of

evidence on this point to conclude only that there is no statistical relationship between the use of the frank and the outcome of an election and that proof of the decisive impact of the privilege in any particular election is elusive, whatever the potential financial benefit of the frank.

## ANALYSIS

It is the plaintiffs' basic position that the First Amendment and the equal protection component of the Fifth Amendment mandate that the government remain neutral in electoral matters and avoid any action which unfairly benefits some participants in the political process to the detriment of others. They claim that by affording what amounts to a postage subsidy which may be used to send materials which promote an incumbent's efforts toward reelection, the franking statute violates this constitutional principle of fairness.

Defendants on the other hand vigorously deny that the franking statute is constitutionally unsound, asserting that the bounds of the franking privilege have been drawn to facilitate the constitutional duty of Members of Congress to communicate with their constituents, and at the same time to limit as much as possible any adverse effects on the political process. It is to the constitutional issues underlying these opposing positions that we now turn our discussion.[11]

## THE FIRST AMENDMENT ASPECTS OF PLAINTIFFS' CLAIMS

■ The "Freedom of Speech" clause of the First Amendment, according to plaintiffs, protects several aspects of the political process with which the frank, by provid-

---

11. The additional issue of plaintiffs' standing to bring this action has been raised at numerous times during this litigation. Defendant-intervenor argues that, despite all the evidence offered by plaintiffs, there is little showing that the "injuries" suffered by members of the plaintiff group who have run against and lost to congressional incumbents were caused by operation of the frank. Our attention is then drawn to several cases, including *Winpisinger v. Watson*, 628 F.2d 133 (D.C.Cir.1980), for the principle that standing cannot be based on speculative and tenuous theories of causation and injury.

We do not regard the issue of standing as a frivolous one and acknowledge that there may be a legitimate concern over whether plaintiffs' limited showings are sufficient to establish standing. We also recognize that the type and cause of injuries claimed in this case are not easily subjected to proof. Rather than to resolve the complexities of this issue, we prefer to confine our holding to plaintiffs' constitutional claims.

ing a subsidy to incumbents, interferes and harms. These include, under plaintiffs' analysis, the ability of candidates to win elective office, to attract financial support, to communicate with citizens, to educate the public and to influence the political discourse of a campaign. While we do not agree with plaintiffs that there is a First Amendment-based right to win elective office, we agree that important aspects of the political process do fall within the general rubric of speech under the First Amendment. As the Supreme Court stated in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971), the constitutional standard that a person's speech remain unfettered and unabridged by governmental action "has its fullest and most urgent application precisely to the conduct of campaigns for political office."

▇▇▇ While plaintiffs do not claim that their right to speak, to vote and to associate for political ends have been *directly* restrained by the franking statute, this absence of direct restraint does not render the First Amendment protections inapplicable. It is well-established that "the Constitution's protection is not limited to direct interference with fundamental rights." *Healy v. James*, 408 U.S. 169, 183, 92 S.Ct. 2338, 2347, 33 L.Ed.2d 266 (1972). Claims of First Amendment violations demand heightened judicial sensitivity, "[e]ven where a challenged regulation restricts freedom of expression only incidentally." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 69 n. 7, 101 S.Ct. 2176, 2183 n. 7, 68 L.Ed.2d 671 (1981). *See also Buckley v. Valeo*, 424 U.S. 1, 21, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976).

▇▇▇ The essential element of plaintiffs' argument is that, to the extent that it enables Members of Congress to use franked mail to promote their own campaign efforts, the franking statute works an effective restriction on challengers' access to the political process, thereby violating rights of expression and association. It is argued that the postal subsidy effectively created by the franking statute violates the rule under the combined First and Fifth Amendments requiring that the government neither impose unequal burdens nor grant unequal benefits upon participants' exercise of their rights to speech and association in the political process. Although we endorse the principle that protection of the fundamental fairness of the political process is necessary to ensure the uninhibited competition of candidates and in ideas which "is at the core of our electoral process," *Williams v. Rhodes*, 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968), and accept that granting financial benefits to some interests may be under some circumstances the same as restricting the First Amendment rights of others, *see Taxation with Representation of Washington v. Rogers*, 676 F.2d 715, 744 (D.C.Cir.1982), we do not accept plaintiffs' contention that the facts of this case require strict judicial scrutiny of the statute at issue.

It is clear from our reading of Supreme Court cases involving governmental restrictions on the exercise of free speech that the standard of strict scrutiny, which requires that the government justify a particular regulation by demonstrating that it "is necessary to serve a compelling interest and that it is narrowly drawn to achieve that end," *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981), is reserved for those instances where the restriction impacts *directly* on the *content* of the restricted communication. *See, e.g., Widmar v. Vincent, supra; Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *Central Hudson Gas & Electric Co. v. Public Service Commission*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). We do not believe that this is such a case, and is distinguishable in important respects from the decision in *Greenberg v. Bolger*, 497

F.Supp. 756 (E.D.N.Y.1980), upon which plaintiffs principally rely.

■ In *Greenberg*, a First Amendment challenge was raised against a statutory scheme granting the two major political parties special reduced mailing rates while denying similar rates to minor parties. Plaintiffs argued in that case that by denying them the same discounted postal rates enjoyed by the major parties Congress had restricted their access to the mails and thereby had violated their First Amendment rights of expression and association. The court correctly observed that regulation of First Amendment rights of expression must be "content neutral," noting that "[t]he Supreme Court has often explained that '... above all else, the first amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Id.*, at 774, quoting *Police Department of the City of Chicago v. Mosley, supra* 408 U.S. at 95–96, 92 S.Ct. at 2289–90. The court then determined that the statute challenged in that case was not content neutral. It reasoned that by drawing a line between major and minor parties, Congress had granted a postal subsidy for the expression of the most "popular" political ideas while refusing similar advantages to those who held political positions substantially different from those of the major parties. It concluded that

> [b]y subsidizing the mailings of the Republicans and Democrats, the government has chosen to benefit those with popular views and burden those with unpopular views. To handicap the mailing of campaign literature because a political party has not achieved a required level of acceptance is not different from censoring speech because of its substance.

*Greenberg*, 497 F.Supp. at 776.

The principal difference between this case and *Greenberg* is in the nature of the restrictions worked by the statute. In *Greenberg* the restrictions were direct and drawn along party lines. They therefore effectively limited the expression of particular political *ideas*. Although this case involves issues of access to the political process similar to those raised in *Greenberg*, the impact here is not upon defined political positions. The lines drawn by the franking statute distinguish *individuals*, not ideas. And because the individuals affected—non-incumbent congressional candidates—must be presumed to represent the full spectrum of political ideology, we cannot hold that the franking privilege creates any discrimination or restriction which is content related. This case does not fall within the rationale for strict First Amendment scrutiny adopted in *Greenberg*.

■ In fact, beyond acknowledging that the franking statute has some limited impact upon speech-related rights, the First Amendment finds little place in our analysis. Although the language of the First Amendment ensures that one's own speech be free, unfettered, and unabridged, it does not alone require that each individual be entitled to this particular privilege of incumbency that certain others may enjoy.[12] For this reason, questions of the constitutionality of governmental-created imbalances are much better suited to analysis under the principle of equal protection than under freedom of speech. It is thus to the Fifth Amendment that we now turn.

## THE FIFTH AMENDMENT CLAIMS

The plaintiffs' equal protection argument is direct and straightforward: by permitting the franking of materials which may be sent for no purpose other than to advance incumbency, the franking statute affords campaign advantages to incumbents, seriously imbalancing the political process to the detriment of any challengers. Plaintiffs argue that because of its impact on rights to free speech under the First Amendment the discrimination worked by

---

**12.** We cannot ignore the fact that the plaintiffs' arguments against this particular advantage of incumbency can also be directed against others, *i.e.*, greater access to the media, local and national, one or more local district offices, staff paid out of public funds, WATS line for telephone calls to and from constituents, etc.

the franking statute may be justified only by demonstrating a compelling interest.

The cases offered by plaintiffs to support their argument that the government may not discriminate among candidates by unequally imposing handicaps on some or granting benefits to others deal almost exclusively with the same sort of content-based discrimination discussed briefly above—drawing lines of distinction by party affiliation or ideology. We find little discussion in case law relating to the advantages which incumbents may enjoy simply by virtue of their incumbency over any challengers who seek this in public office.

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), for example, the Supreme Court held that patronage dismissals violated the First and Fourteenth Amendments. The basis of the holding, however, was not necessarily that an incumbent might use the system to tip the electoral balance unfairly against any challenger, but that the threat of dismissal severely restricted the political beliefs and associations of the employees affected. The Court held that the requirement that employees pledge political allegiance to one party or another, work for the election of other candidates of the incumbent party, contribute a portion of their wages to the party, or obtain the sponsorship of a member of the party, all in order to maintain their jobs imposed an unconstitutional condition on the right to continued employment. There is no similar condition in this case. The franking statute imposes no direct condition upon the right of any person to challenge an incumbent, to support one or another party in a particular election, or to use the mails. Its impact upon political speech and association is at most indirect, and then only to the extent that it may make campaign-related communication through the mails more expensive for a non-incumbent candidate than for the incumbent who seeks reelection and uses franked mail to promote that end.

We cannot overlook the fact that, despite their broadside objections to the franking statute, plaintiffs concede that the frank serves an essential public purpose in facilitating communication with constituents and that some sort of franking privilege is necessary in the performance of official congressional business. They concede that the problem is merely one of drawing lines—striking a proper balance between legitimate and illegitimate uses of the frank.

The franking statute effectively draws two lines of demarcation. The first is drawn by the granting of the franking privilege to Members of Congress only. In general, this distinguishes Congress from the general public, and also has the effect of drawing the line between incumbent and non-incumbent congressional candidates. Plaintiffs do not argue that non-incumbents should also be afforded the franking privilege. They seek only to limit its use by Members of Congress. The second line drawn by Congress draws a distinction between official and unofficial use of the frank. Our sole concern is with this second line of demarcation and to this we direct our attention.

Under present practice a mailing is considered to be "official" if, on its face, it falls within the permitted types (or at least outside of the prohibited types) of materials listed under section 3210. The statutory test does not look to motives, but only to "the type and content of the mail." § 3210(e). Plaintiffs argue that attention to content only, without considering the motives for sending a particular mailing, enables Members to use the frank for the *unofficial* purposes of promoting reelection. Plaintiffs thus fault the present franking statute and congressional practice for failing to subject franked mailings to a test of official versus unofficial *motivation*. Absent standards based on underlying motives, plaintiffs urge that the franking statute be modified to eliminate categories of mailings which have been prone to abuse in the past. We cannot accept plaintiffs' suggested cause of action.

▄▄ Were the frank shown to be available and widely used for reelection purposes and had plaintiffs demonstrated that such use has a substantial detrimental impact on

opposing candidates or members of the voting public seeking to educate themselves on the candidates and the issues, plaintiffs' claims, particularly those based on the First Amendment, would have considerable merit. But such level of interference with the electoral process has not been shown in this case. We are hesitant to apply a standard under the guise of strict judicial scrutiny to a situation where there has been no demonstration of significant harm to the plaintiffs' constitutional rights. The conceded and undisputed legitimate interests promoted by the franking statute are sufficient to justify the limited impacts on the rights of the plaintiff class and to satisfy the invocation of the rational basis test, which we apply in this case. We cannot hold the franking statute unconstitutional simply because it sets forth a standard to determine "official" uses of the frank different from that proposed by plaintiffs.

 It is important to view the franking activities of Members of Congress from an overall perspective. It seems undeniable that all mailings, franked and unfranked, from any particular Member of Congress may be grouped into three types. The first type is composed of "official" mailings, those related directly to the legislative and representative functions of Congress. This is the type of communication which Members of Congress arguably are under a duty to provide and to which the frank has been extended over the past 200 years. At the other extreme are mailings which are on their face political or private and therefore "unofficial" in nature. Congress itself has recognized the dangers, constitutional as well as practical, of extending the franking privilege to these types of mailings and has excluded them or expressly prohibited them under the statute and rules in both Houses. Between these two extremes lies a class of mailings whose purposes are less easily discernible. For example, it is undeniable that Senator X, acting in his elected capacity, should have a right to make mailings within this middle area related to his official duties. It is equally obvious that this same individual acting as candidate for the Senate has an interest in mailing the same material to prospective voters to promote his campaign efforts. Thus the motivations, even behind a particular mailing, may be mixed. Plaintiffs' complaints here can only be about the actions and purposes of the candidate, however, and not the senator.

Congress drafted the franking statute expressly to include many of the types of mailings which unquestionably fall within this middle area. This of itself does not require that we invalidate the scheme as unconstitutional. The question before us is not whether the particular line which Congress has drawn between "official" and "unofficial" uses of the frank necessarily has the least possible potential, in comparison with other methods of drawing the line, for adversely affecting challengers' effective access to the mails. The question is only whether the line is a reasonable one.

 A statutory scheme need not be drafted or even administered so as to eliminate completely all possible abuses before it is constitutionally acceptable. We can be concerned only with whether the standard adopted bears a rational relation to the twin goals at hand: one, to facilitate (even encourage) official communication and two, to discourage or eliminate unofficial communication. It is clear from the record that Congress has recognized the basic principle that government funds should not be spent to help incumbents gain reelection. The details of the franking scheme, including its distinction between official and unofficial mailings, appear to be rationally designed to work for that end. (It is relevant in this regard that the record in this case consists principally of *abuses* rather than routine uses of the franking privilege). It would be most inappropriate for the judiciary to step in and demand that Congress restructure this scheme under the circumstances of this case.

To state the obvious, it simply is impossible to draw and enforce a perfect line between the official and political business of Members of Congress. The franking privilege is only one of many perquisites afford-

ed to them which may be turned one way or another into a campaign advantage over any challenger. We have already accepted as an assumption and stressed the fact that an incumbent is, by virtue of his incumbency alone, much more visible to the voting public than is a would-be challenger. He has greater access to the media, both local and national; he usually has one or more offices in his home district, in addition to his Washington office; he has a staff paid out of public funds; he has a WATS line for telephone calls which he may use to communicate with his constituents.

Plaintiffs do not suggest that the incumbents' use of these tools of office be strictly limited to purposes which cannot possibly contribute to efforts at reelection. This would be a most difficult standard to administer in any case, for each and every act of an elected representative may, in a political context, be seen as an effort to demonstrate that the voters' choice was a good one. It is impossible, without probing into the deepest thoughts and motives of an individual Member of Congress, to determine exactly why he votes as he does on a particular issue, why he casts a letter to a constituent in the terms in which it is cast, why he communicates with other Members of Congress as he does, why he assigns particular staff functions as he does, or why he does any of the myriad of things that a Member does in his day-to-day routine. It is no less difficult to apply and administer a subjective standard in the use of the frank. Moreover, we cannot require that such a standard be substituted for what we accept as an already reasonable objective standard adopted under section 3210.

For similar reasons, we cannot hold that the particular types of mailings to which plaintiffs object are so prone to abuse that they should not be permitted. Just as plaintiffs have identified the suitability of mass mailings (targeted or general), newsletters, questionnaires and other materials for campaign purposes, there is not a type of mailing challenged which is not also suitable for legitimate "official" purposes. Targeted mailings, for example, may be a means of directing discussion or information on particular issues to those groups in a particular Member's constituency which might be most affected, at the same time saving the cost of preparing and mailing information to individuals who are less likely to be interested. And notwithstanding allegations that questionnaires are most often used to obtain demographic information beneficial to a candidacy, it goes without saying that any method of obtaining constituents' views and impressions on particular issues may be invaluable to a Member of Congress who truly considers himself responsible to the people.[13] It does little, therefore, for the plaintiffs to emphasize the potential in these types of mailings for abuse, without also acknowledging the legitimate ends to which they are put. We are not convinced by any of plaintiffs' arguments that there exists no rational and legitimate basis for Congress' decision to retain these particular "middle area" uses of the frank within the stated category of "official use," and we defer to the judgment embodied in the statute.

PRUDENTIAL CONSIDERATIONS

Our deference to Congress is guided also by important prudential considerations. We must give weight to the fact, mentioned earlier, that section 3210 was originally enacted in an attempt to curb widespread abuses of the franking privilege. It has since been refined by detailed regulations in each house to meet the more obvious of objections which arise even under its amended language. The House and Senate have also established machinery to moni-

---

**13.** While we need not agree with defendant-intervenor's sanguine appraisal that the typical member follows the advice of Edmund Burke to the voters of Bristol in 1774 and votes his own conscience rather than following the expressed wishes of his constituents, it is nonetheless true that members, to be successful representatives, must at least learn at the outset the views of those who put them in office. Thereafter, they must keep themselves informed.

tor, review, and receive complaints concerning uses of the frank.[14] The plaintiffs seek to have the Congress, through judicial compulsion, "redraw the line" and strike a different balance. This we decline to do for at least two compelling reasons. First, the distinction between "official" and "unofficial" cannot be sharply defined or delineated and for the court to assume this burden would be an impossible task. Second, to grant the relief which plaintiffs seek would in effect require us to issue rules of behavior superseding those that Congress, a coordinate branch of government, has responsibly set for itself. It is not this Court's function to examine the policing efforts of committees created by Congress to deal with the particular types of concerns raised by plaintiffs in this case with an eye to compel even more refined standards and closer examination. The United States Court of Appeals for the District of Columbia recently manifested a reluctance "to develop rules of behavior for the Legislative Branch," or "to monitor every action taken by a senator and his aide in an effort to determine whether it is sufficiently 'official' or too 'political,'" *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1384, 1385 (D.C.Cir.1981). We follow course in this case.

CONCLUSION

We do not suggest that the franking privilege may never be shown to create such an imbalance in the campaign process as to constitute a cognizable interference with important rights. We hold only that the level of impact has not been shown to be sufficient in this case for us to assume the responsibility of redrafting a statute or promulgating regulations to govern the congressional use of the frank. Our rationale for rejecting plaintiffs' claims under the First and Fifth Amendments holds as well for the challenge raised under the

General Welfare Clause of Article I, Section 8. We find no constitutional violation.

For the foregoing reasons we grant judgment to the defendants and defendant-intervenor and dismiss the complaint.

An order consistent with the foregoing has been issued this day.

ORDER

Upon consideration of plaintiffs' motion for summary judgment, defendants' and intervenor-defendant's motions for summary judgment, the oppositions of the respective parties thereto, the motion of the United States Senate, amicus curiae, in support of the motions of defendants and intervening defendant and in opposition to plaintiff's motion for summary judgment, and the entire record and after argument, it is by the Court this 2nd day of September, 1982,

ORDERED that:

(1) plaintiffs' motion for summary judgment be and the same is hereby denied;

(2) The motions of defendants and the intervening defendant for summary judgment be and the same hereby are granted;

(3) The above-entitled action shall stand dismissed.

---

14. For example, each house has its own method for policing mass mailings, which, as must be apparent, are the greatest single source of plaintiffs' claims of abuse. In the House, before sending a mass mailing a Member must first submit the same to the Franking Commission for an advisory opinion. In the Senate all mass mailings must be registered with the Secretary of the Senate and are available for public inspection.