**COALITION TO END the PERMANENT CONGRESS, et al., Plaintiffs,**

v.

**Marvin T. RUNYON, et al., Defendants.**

**Civ. A. No. 92–1172 (JHG).**

United States District Court,
District of Columbia.

June 26, 1992.

Paul R.Q. Wolfson, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Daniel Standish, Asst. U.S. Atty., Steven Ross, Gen. Counsel to the Clerk of the House of Representatives, Washington, D.C., for defendants.

## MEMORANDUM OPINION
## AND ORDER

JOYCE HENS GREEN, District Judge.

On May 18, 1992, plaintiffs Coalition to End the Permanent Congress ("CEPC"), Public Citizen, and National Taxpayers Union initiated this action against Marvin T. Runyon, Postmaster General, and Nicholas F. Brady, Secretary of the Treasury, (collectively, "Executive defendants") and against Donald K. Anderson, Clerk of the United States House of Representatives ("House"), Michael Shinay, Acting Postmaster of the House, and the House Commission on Congressional Mailing Standards (collectively, "House defendants").[1] Plaintiffs challenge on its face 39 U.S.C. § 3210(d)(1)(B), the provision that grants to incumbent Members of the House of Representatives ("Members") the privilege to send mass mailings under the congressional frank to persons who do not live in the congressional district from which the incumbent was elected, but who, as a result of reapportionment, reside in the district where the incumbent is running in the next election.

There is little question that incumbents enjoy certain benefits by virtue of the fact that they have been elected to office. They experience a visibility that a challenger does not necessarily possess, for example. It is also undisputed that the privilege of incumbent Members to send mass mailings under the congressional frank is a valuable tool in facilitating communication between Congress and voters on public issues. In fact, on the very face of the statute at issue, it is apparent that Congress has bestowed upon itself considerable power in deciding which material should be deemed frankable.

Nonetheless, it is not this Court's mandate "to examine the policing efforts of committees created by Congress to deal with the particular types of concerns raised by plaintiffs in this case with an eye to compel even more refined standards and closer examination." *Common Cause v. Bolger*, 574 F.Supp. 672, 685 (three-judge court), *aff'd mem.*, 461 U.S. 911, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983). It is not the judiciary's function to develop rules of behavior for the Legislative Branch of the federal government. *See United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1384–85 (D.C.Cir.1981). Rather, in a case like the instant one, it is the province of Congress to resolve inequities by striking a different balance or devising another scheme. Under the standard of scrutiny that must be applied, the Court cannot hold that the franking provision challenged here is unconstitutional under either the First Amendment or the Fifth Amendment of the Constitution.

## I. BACKGROUND

### A. Procedural History

On June 1, 1992, plaintiffs filed a motion for a preliminary injunction. In response to that motion, House defendants submitted a motion for summary judgment. Executive defendants also submitted an opposition to plaintiffs' motion indicating that they "do not, for [purposes of the] preliminary injunction motion, take a position on the validity of the statute in question" but "oppose the entry of a[n] injunction that would require the Postal Service to ascertain the destination of franked mail and refuse its delivery because the destination lies outside an existing congressional district." Executive Branch Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Exec. Opp."), at 2–3. The Court set oral argument for June 25, 1992 and at both sides' request, consolidated its decision on the merits with its ruling on the motion for a preliminary injunction. *See* Order, dated June 18, 1992.

### B. Statutory Background

Section 3210(d)(1) of Title 39 of the United States Code, the provision challenged here, states:

1. The Court subsequently granted plaintiffs' motion to amend the complaint to add as plaintiffs five individuals who are challenging against incumbent Members of Congress ("Members") in the 1992 election cycle.

(d)(1) A member of Congress may mail franked mail with a simplified form of address for delivery [2]—

(A) within that area constituting the congressional district or State from which he was elected; and

(B) with respect to a Member of the House of Representatives on and after the date on which the proposed redistricting of congressional districts in his State by legislative or judicial proceedings is initially completed (whether or not the redistricting is actually in effect), within any additional area of each congressional district proposed or established in such redistricting and containing all or part of the area constituting the congressional district from which he was elected, unless and until the congressional district so proposed or established is changed by legislative or judicial proceedings.

The privilege of sending mail under the frank is intended "to assist and expedite the conduct of official business, activities, and duties of the Congress of the United States." 39 U.S.C. § 3210(a)(1). Official business is defined as:

[A]ll matters which directly or indirectly pertain to the legislative process or to any congressional representative functions generally or to the functioning, working, or operating of the Congress and the performance of official duties in connection therewith, and shall include, but not to be limited to, the conveying of information to the public, and the requesting of the views of the public, or the views and information of other authority of government, as a guide or a means of assistance in the performance of those functions.

*Id.* § 3210(a)(2).

Material that is frankable includes, but is not limited to, the following:

(A) mail matter to any person and to all agencies and officials of Federal, State, and local governments regarding pro-

grams, decisions, and other related matters of public concern or public service, including any matter relating to actions of a past or current Congress;

(B) the usual and customary congressional newsletter or press release which may deal with such matters as the impact of laws and decisions on State and local governments and individual citizens; reports on public and official actions taken by Members of Congress; and discussions of proposed or pending legislation or governmental actions and the positions of the Members of Congress on, and arguments for or against, such matters;

(C) the usual and customary congressional questionnaire seeking public opinion on any law, pending or proposed legislation, public issue, or subject;

(D) mail matter dispatched by a Member of Congress between his Washington office and any congressional district offices, or between his district offices;

(E) mail matter expressing condolences to a person who has suffered a loss or congratulations to a person which has achieved some personal or public distinction;

(F) mail matter expressing congratulations to a person who has achieved some public distinction;

(G) mail matter, including general mass mailings, which consists of Federal laws, Federal regulations, other Federal publications, publications purchased with Federal funds, or publications containing items of general information;

(H) mail matter which consists of voter registration or election information or assistance prepared and mailed in a nonpartisan manner;

(I) mail matter which constitutes or includes a biography or autobiography of any Member of, or Member-elect to, Congress or any biographical or autobio-

---

**2.** The Postal Service defines the simplified format as follows:

Simplified address Congressional mailings are addressed "Postal Customer–Local," or, from long-term practice, "Postal Patron–Local," on the first line, with the Congressional district

identified in the second line and the state in the third line for a U.S. Representative, or with only the state identified in the second line for a U.S. Senator.

Postal Operations Manual § 453.321, attached as Exhibit ("Exh.") A to Exec. Opp.

graphical material concerning such Member or Member-elect or the spouse or other members of the family of such Member or Member-elect, and which is so mailed as a part of a Federal publication or in response to a specific request therefor and is not included for publicity purposes in a newsletter or other general mass mailing of the Member or Member-elect under the franking privilege; or (J) mail matter which contains a picture, sketch, or other likeness of any Member or Member-elect and which is so mailed as a part of a Federal publication or in response to a specific request therefor and, when contained in a newsletter or other general mass mailing of any Member or Member-elect, is not of such size, or does not occur with such frequency in the mail matter concerned, as to lead to the conclusion that the purpose of such picture, sketch, or likeness is to advertise the Member or Member-elect rather than to illustrate accompanying text.

*Id.* § 3210(a)(3).

In contrast, some of the unauthorized uses of the frank are specified in the statute as follows: personal mailings unrelated to official business; mailings that are "laudatory and complimentary" of a member "on a purely personal or political basis"; "greetings" from the spouse or other members of the Congressperson's family; reports on how and when the Member or his or her spouse or family spends time other than in connection with legislative, representative, and "other official functions"; mail "which specifically solicits political support"; and "any mass mailing ... less than 60 days immediately before the date of any primary or general election." *Id.* § 3210(a)(5), (6).

### C. Factual Background

As a result of the 1990 census, 21 states, representing 310 of 435 Members of the House of Representatives, will either gain or lose seats in the House.[3] Reapportionment will result in many voters being transferred from one congressional district to another.

CEPC's members include three challengers who are running or ran against incumbent Members of the House of Representatives this year. In each election, the districts will be substantially altered by the reapportionment schemes. As illustration, Dick Mourdock,[4] the Republican Party nominee for the general election in the new 8th District of Indiana, is running against a Democratic incumbent, Frank McCloskey. Approximately 12% of the residents who will be in the new district do not live in Rep. McCloskey's current district. Jerry Cecil was a candidate for the Democratic Party nomination for the general election in the new 5th District of Kentucky; the Republican Party candidate is an incumbent, Harold Rogers. About 50% of the residents who will be in the new district do not live in Rep. Rogers' current district. Similarly, Dick Simpson is a Democrat who ran unsuccessfully against an incumbent, Dan Rostenkowski, in the party primary election for the new 5th District of Illinois. Approximately 57% of the residents who will be in the new district do not live in Rep. Rostenkowski's current district.

Five other challengers are currently running against incumbent Members who have sent franked mail to redistricted residents. For example, Harry Lepinske is the Republican Party nominee for the general election in the new 3rd District of Illinois, and is running against a Democratic incumbent, Bill Lipinski. More than 218,000 residents of the new district do not live in Rep. Lipinski's current district. Similarly, Terry Lee Moser is the Democratic Party nomi-

---

**3.** The states gaining seats are Arizona, California, Florida, Georgia, North Carolina, Texas, Virginia, and Washington. The states losing seats are Illinois, Iowa, Kansas, Kentucky, Louisiana, Massachusetts, Michigan, Montana, New Jersey, New York, Ohio, Pennsylvania, and West Virginia. *See United States Department of Commerce v. Montana,* — U.S. —, — nn. 4, 5, 112 S.Ct. 1415, 1418 nn. 4, 5, 118 L.Ed.2d 87 (1992).

**4.** The name of each individual referenced herein is in accordance with the parties' pleadings, including plaintiffs' declarations and/or the literature provided by the various Members of Congress, and is not necessarily the candidate's or incumbent's complete, formal name.

nee for the general election in the new 19th District of Texas and is running against a Republican incumbent, Larry Combest. Approximately half of the residents who will be in the new district do not live in Rep. Combest's current district. Again, Dan Sosa, Jr. is a candidate for the Democratic Party nomination for the general election in the new 2nd District of New Mexico, and his opponent is the Republican incumbent, Joe Skeen. Approximately 10% of the residents who will be included in the new district do not live in Rep. Skeen's current district. Ben Waldman is the Republican Party candidate for the election in the new 3rd District of West Virginia and is running against a Democratic incumbent, Nick Joe Rahall. Approximately one-third of the residents who will be in the new district do not live in Rep. Rahall's current district. Lastly, Barry Watkins is the Democratic Party nominee for the general election in the new 6th District of Illinois and is running against Republican incumbent, Henry Hyde. Approximately 15% of the residents who will be in the new district do not live in Rep. Hyde's current district.

Plaintiffs point to several examples of postal patron mailings in which the incumbent represents himself as the loyal spokesperson of the voters who is working hard in Washington to promote their needs and the national interest. Specifically, Rep. Bill Lipinski sent newsletters to redistricted voters describing "four stories about how listening to my constituents has made a difference. After reading these stories, I hope you will know that if you have an idea or a problem with our Government, you have someplace to go." Exh. 3 to Declaration of Harry C. Lepinske ("Lepinske Decl."), attached to Plaintiffs' Motion for a Preliminary Injunction ("Pl. Motion"). He goes on to explain how he secured disability benefits, intervened with the Secretary of Commerce on behalf of local industry, obtained transit funds for Chicago, and introduced bills to promote home ownership.

Similarly, Rep. Dan Rostenkowski informed new voters, "Job security, the cost of health care, the high price of education, and the pinch of local, state and federal taxes are foremost on the minds of people

on the North and northwest Sides. I've tried to carry these concerns back to Washington and fight for policies that will help provide some relief and hope for the future. These battles are not always easy." Exh. 2 to Declaration of Dick Simpson ("Simpson Decl."), attached to Pl. Motion. And Rep. Larry Combest's newsletter to redistricted voters took "the opportunity to briefly introduce [him]self while also seeking [their] viewpoints and concerns." Exh. to Declaration of Terry Lee Moser ("Moser Decl."). Similarly, Rep. Martin Frost, while noting in an introductory letter to voters that the Texas redistricting plan "does not take effect until after the 1992 elections," welcomed new voters to the "24th District, which I currently represent." Exh. to Declaration of Steve Masterson ("Masterson Decl.").

Rep. Jim Moran also sent newsletters to redistricted voters, welcoming them to the new 8th congressional district of Virginia. One newsletter reported on Rep. Moran's successful efforts "in getting passage of a congressional resolution" addressing Northern Virginia's credit crunch; his co-sponsorship of legislation that would enable more families to purchase homes and that would assist in their ability to fund their children's college education; his co-sponsorship of legislation to raise the personal exemption for minor children; his support for extending unemployment benefits; his participation in efforts to reform the banking system; and his success in preventing relocation of the Central Intelligence Agency ("CIA") operations to West Virginia. Exh. 1 to Declaration of Kyle E. McSlarrow ("McSlarrow Decl.").

By the same token, Rep. Jim Jontz sent a newsletter introducing himself to the redistricted voters of Warren County, Indiana. Although he advised the redistricted voters that the new districts would not take effect until the 1992 election, he indicated that new voters could telephone his Washington office on a toll-free number every Tuesday evening and that many constituent services were available to them through his office. He also invited new voters to attend a town meeting in order to advise him about their

views on important issues facing Warren County and the nation. Exh. 1 to Pl. Motion.

## II. DISCUSSION

### A. Executive Defendants

■ As part of their proposed relief, plaintiffs seek an Order enjoining the Postal Service from delivering franked postal patron mail to any postal stops or boxes located outside the boundaries of the congressional district from which the Member sending the mail was most recently elected. The complaint as it pertains to the Executive defendants should clearly be dismissed.

First, plaintiffs' amended complaint focuses principally on the rights and responsibilities of the Members of the Legislative Branch of the federal government; in contrast, the Executive defendants' role with respect to the statute is ministerial. Even if the Court had decided that the statutory provision challenged here is unconstitutional, it would be unnecessary to implicate the Executive Branch. As plaintiffs' counsel conceded at oral argument, a simple declaration that the statute is unconstitutional "will stop [the mailings] in [their] tracks." By moving against the Executive defendants, plaintiffs have, in essence, requested that the Court order the Executive Branch to police the conduct of the Legislative Branch. Such relief is entirely inappropriate.

Further, in order to ascertain whether the mail is destined for a newly redistricted area, Executive defendants would be required to implement a manual verification system. A postal worker would have to check the ZIP Code on the label of the letter or package against a master list of ZIP Codes in the congressional district, and for ZIP Codes that include more than one district, the postal worker would be required to investigate further the precise location of the addressee. Based on the fact that the Postal Service has more than 200,000 carrier routes and considering the volume of mailings handled and the time involved in obtaining, checking, and returning packages, the Postal Service estimates conservatively that the costs associated with such a verification process could amount to as much as $1,728,000. Declaration of Howard S. Alenier ("Alenier Decl."), Exh. B to Exec. Opp., ¶ 5.

■ Finally, the United States Department of the Treasury only has disbursement authority for "public money available for expenditure by an executive agency." 31 U.S.C. § 3321. The term "executive agency" is defined as "a department, agency, or instrumentality in the executive branch of the United States Government." 31 U.S.C. § 102. Thus, the allegation in plaintiffs' complaint that the Treasury Department is responsible for disbursement of legislative appropriations is incorrect.

Under these circumstances, the Court sees no reason why the Executive defendants should be parties to this dispute. Accordingly, they shall be dismissed from this cause.

### B. House Defendants

It is plaintiffs' basic position that the First Amendment and the equal protection component of the Fifth Amendment prohibit the government from taking action that unfairly benefits some participants in the political process to the detriment of others. By affording what amounts to a postage subsidy for incumbents, plaintiffs contend that the provision of the franking statute that allows Members of the House of Representatives to send mass mailings to persons who do not live in the congressional district from which the incumbent was elected, but who reside in the district where the incumbent is running in the next election, violates the constitutional principle of nondiscrimination. Plaintiffs' claims must be rejected.

#### 1. *Standard of Review*

■ As a preliminary matter, plaintiffs urge the Court to apply a heightened standard of scrutiny to the facts of this case. In particular, they contend, because the statute favors incumbent candidates over other candidates, the case must be analyzed as an election case and subjected to a

type of strict scrutiny analysis. Plaintiffs' argument has been rejected before and is unpersuasive.

Cases applying heightened scrutiny deal with discriminated-against classes or content-based discrimination, in which lines of distinction are drawn according to party affiliation or ideology. In fact, in several of the cases on which plaintiffs rely—*Socialist Workers Party v. Rockefeller*, 314 F.Supp. 984 (S.D.N.Y.) (three-judge court), *aff'd mem.*, 400 U.S. 806, 91 S.Ct. 65, 27 L.Ed.2d 38 (1970); *Greenberg v. Bolger*, 497 F.Supp. 756 (E.D.N.Y.1980); *Libertarian Party of Indiana v. Marion County Board of Voter Registration*, 778 F.Supp. 1458 (S.D.Ind.1991)—the restrictions at issue were along party lines. For example, in *Libertarian Party*, the Court considered whether providing registration lists to major but not minor political parties violated the equal protection clause of the Fourteenth Amendment. As that Court articulated the claim, "The plaintiffs in this case seek equal access to voters, meaning that significant advantages may not be accorded to two major political parties and arbitrarily denied to others." 778 F.Supp. at 1463. Similarly, in *Greenberg v. Bolger*, the restrictions were drawn according to party affiliation and thus, effectively limited the expression of particular ideas. By the same token, the challenged statute in *Socialist Workers* explicitly provided voter lists to major parties but not to minor ones.

Although this case involves questions of access to the political process, the impact of the legislation challenged here is not on particular political positions or affiliations. Indeed, plaintiffs' counsel conceded at oral argument that § 3210(d)(1)(B) does not discriminate on the basis of ideology. ・ Rather, the lines drawn by the franking statute distinguish not ideas but individuals—incumbents "represent[ing] the full spectrum of political ideology"[5] versus non-incumbent congressional candidates "represent[ing] the full spectrum of political ideology."[6] Accordingly, in considering plaintiffs' First Amendment and Fifth Amendment claims, the Court need only discern whether there is a rational basis for the legislation.

### 2. *First Amendment Challenge*

■ According to plaintiffs, by giving incumbent Members of Congress a subsidy for their communications with voters, § 3210(d)(1)(B) diminishes the effectiveness of challengers' efforts and forces them to incur significantly greater costs in their efforts to reach voters. The essential element of plaintiffs' claim is that government support for only incumbents imposes heavy financial burdens on the challengers' efforts to circulate their message to the public.

Under some circumstances, granting financial benefits to some interests may be similar to restricting the First Amendment rights of others. *See Taxation With Representation of Washington v. Rogers*, 676 F.2d 715, 744 (D.C.Cir.1982). And allowing incumbents to send postal patron mail to redistricted voters may have some limited impact on the speech-related rights of non-incumbents. But beyond that, the First Amendment finds little place in the Court's analysis. As the three-judge court explained in *Common Cause:*

> Although the language of the First Amendment ensures that one's own speech be free, unfettered, and unabridged, it does not alone require that each individual be entitled to this particular privilege of incumbency that certain others may enjoy. For this reason, questions of the constitutionality of governmental-created imbalances are much better suited to analysis under the principle of equal protection than under freedom of speech.

574 F.Supp. at 681. (footnote omitted). Accordingly, House defendants' motion for summary judgment on plaintiffs' First Amendment claim shall be granted.

### 3. *Fifth Amendment Challenge*

■ Plaintiffs' equal protection challenge is straightforward: By subsidizing

---

**5.** *Common Cause*, 574 F.Supp. at 681.

**6.** *Id.*

the access of particular candidates to the voters and denying such subsidies to others, the government is, in effect, aiding the election chances of one candidate or political party over others. As with plaintiffs' First Amendment challenge, plaintiffs' Fifth Amendment claim also must fail.

House defendants advance several interests to support their position that § 3210(d)(1)(B) should survive the equal protection challenge under the relaxed rational basis test: The statute serves the public's desire to be informed and to communicate on policy issues that may follow redistricted lines; and the provision helps to avoid disputes among Members over the right to communicate with voters in a redistricted area. Although plaintiffs argue that the only apparent purpose of § 3210(d)(1)(B) is to promote the reelection of incumbents, the franking scheme is rationally designed to promote legitimate ends.

First, it was rational for Members of Congress to conclude that they have a duty to serve the redistricted voters, and the public has a correlative expectation to obtain communications from the Representatives after reapportionment but before they become constituents. Redistricted voters maintain an interest in receiving information about the present and potential direction of their new district. In addition, they have a vital interest in influencing policy decisions of their potential Representatives.

In support of their position, House defendants point specifically to a health care questionnaire, which was distributed throughout a newly redistricted area and which received remarkable response. As Melinda Plaisier, Administrative Assistant to Rep. Frank McCloskey, explained:

[One mailing], which was dropped in December 1991, was solely dedicated to the health care crisis. This piece contained a summary of the major legislative initiatives that were currently before the Congress, followed by a questionnaire. The primary purpose of this piece was to solicit input from the district on specific health care initiatives and the health care crisis in general.... We received over 3,000 responses, which we tallied. The tally yielded 26 categories of health concerns of residents of southwestern Indiana. Many responses contained lengthy, hand-written letters detailing their personal experiences and problems with health care (or the lack thereof). The responses provided a very personal and graphic view of the impact problems with our health care system are having on individuals and families. We felt, given the purpose of the mailing and the information sought, it would be much more valuable to include both the "old" and "new" district, so as to provide for a broader base of citizen opinion.... The information obtained has been vital to the Congressman's decision-making on the health care issue.

Declaration of Melinda K. Plaisier, attached as Exh. 8 to House Defendants' Motion for Summary Judgment ("House Motion"), ¶¶ 7–9.[7]

In addition, as plaintiffs' counsel conceded at oral argument, it was reasonable for Congress to recognize that one way to avoid disputes about legitimate uses of the frank would be to acknowledge that during redistricting, the Member representing an area according to the "old" lines and a Member to whose district the area had been added both might claim the right to this kind of addressing. Chairman Udall

---

7. Interestingly, at least one Member of Congress expressed a greater interest in exchanging ideas with redistricted voters than with his former constituents. As Representative Charles H. Wilson pointed out during the hearings, "Why should a Member send a questionnaire on a mass-mailing basis to his old district which he no longer represents? Now, in my case, there was no incumbent to represent most of my old district. Therefore, I was still faced with the

responsibility of servicing the people in my former district. I had to use the frank for official mail within that district but I also had a duty to serve the new area once a redistricting bill became effective." *Use of the Postal Frank: Hearings Before the Special Ad Hoc Subcommittee of the House Committee on Post Office and Civil Service,* H.R. 3180, 93rd Cong., 1st Sess. 81 (1980) ("*Frank Hearings*"), attached as Exh. 1 to House Motion, at 82.

described the tension during the Frank Hearings:

> There is a great deal of confusion but let me tell you how we try to meet it. You can have all kinds of conflict about what district you now represent. We had situations last year in which I was elected from this county but this county has no[w] been taken out of my district and Dave Henderson in my same State has been given that county in his new district.

> I say I represent the district and use the frank. Now he says he now represents the district.... That is why we proceed from that basis to give you postal patron privileges there and then [tack] onto that such areas as may have been added to that district from which you were elected by subsequent court action or redistricting. I think that is the only safe, legal aspect you can take.

*Frank Hearings*, at 80.

Under the rational relation test, it is not the judiciary's task to adjust the advantages or disadvantages of major-party incumbents, and the Court is not convinced that there exists no legitimate basis for Congress' decision to permit incumbents to send postal patron mail to redistricted voters. Accordingly, House defendants' motion for summary judgment on plaintiffs' Fifth Amendment claim shall also be granted.[8]

### III. CONCLUSION

It should be emphasized that the Court is not holding that Congress has struck the best or most fair balance. But whether the Court can conceive of a way to restructure the present franking scheme is, in this case, irrelevant. In reviewing the actions of Congress here, the Court is constrained to consider only whether the statute is constitutional. It is the responsibility of Congress to determine the most appropriate solution.

Interestingly, Congress has already seized the moment to reexamine its policy of permitting incumbent Members to send postal patron mail to redistricted voters. In fact, on June 24, 1992, the House voted almost unanimously—417 ayes, 2 noes, and 15 not voting—to amend the franking statute to eliminate that privilege upon the date of enactment of the Legislative Appropriations Act. As one Congressperson described Congress' present sentiment, "Members have been mailing on borrowed time long enough." 138 Cong.Rec. H5145 (daily ed. June 24, 1992) (statement of Rep. Thomas).

Accordingly, for the reasons set forth above, it is hereby

ORDERED that the Executive defendants are dismissed from this case; it is

FURTHER ORDERED plaintiffs' motion for injunctive relief is denied; it is

FURTHER ORDERED that House defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

---

8. It is not entirely clear that plaintiffs even have standing to bring this action. In particular, there has been little showing that the injuries suffered by members of the plaintiff group were caused by the operation of the frank. On the contrary, House defendants have presented detailed submissions by two authorities who describe why § 3210(d)(1)(B) does not constitute interference with the electoral process: It was not a major factor in 1982; it does not compare in impact with factors like national trends against incumbents or the economy; and written mailings constitute only one form of communication. *See* Declaration of Albert D. Cover ("Cover Decl."), attached as Exh. 4 to House Motion. Although the issue of standing is not a "frivolous" one and the type of injuries claimed are not easily subjected to proof, "[r]ather than to resolve the complexities of this issue, [the Court] prefer[s] to confine [its] holding to plaintiffs' constitutional claims." *Common Cause*, 574 F.Supp. at 679 n. 11.