COALITION TO END THE
PERMANENT CONGRESS,
et al., Appellants,

v.

Marvin T. RUNYON, et al., Donald
K. Anderson, et al.

No. 92–5239.

United States Court of Appeals,
District of Columbia Circuit.

Argued July 27, 1992.

Decided July 30, 1992.

Nov. 13, 1992.

Paul R.Q. Wolfson argued the cause for appellants. With him on the brief was Alan B. Morrison.

Charles Tiefer, Deputy Gen. Counsel to the Clerk, U.S. House of Representatives, argued the cause for appellees. With him on the brief was Steven R. Ross, Gen. Counsel to the Clerk.

Before: WALD, SILBERMAN, and RANDOLPH, Circuit Judges.

Statement for the court filed Per Curiam.

Separate statement dissenting from the per curiam disposition filed by Circuit Judge SILBERMAN.

Separate opinion on the merits filed by Circuit Judge SILBERMAN.

PER CURIAM:

This case came before the court on an expedited appeal. On July 30, 1992, after briefing and oral argument, the court issued a judgment, joined by Judges Silberman and Randolph, with Judge Wald dissenting, declaring 39 U.S.C. § 3210(d)(1)(B) unconstitutional in violation of the First and Fifth Amendments to the Constitution. This provision, then part of the congressional franking statute, permitted incumbents to send free mass mailings to persons in areas added to their districts by redistricting. Accompanying the court's judgment were brief opinions by each member of the panel. The judgment contained a notation indicating that neither it nor the accompanying opinions were to be published. The judgment also stated that "Expanded opinions will issue at a later date."

Since the entry of the judgment, there has been a development—of which we take judicial notice—rendering it imprudent for

us to issue expanded opinions. On October 6, 1992, before the time for filing a petition for a writ of certiorari in the Supreme Court had expired, Congress repealed 39 U.S.C. § 3210(d)(1)(B). Pub.L. No. 102–392, § 309, 106 Stat. 1703 (1992). Our judgment therefore can have no future effect. If a petition for a writ of certiorari had been filed and granted, the long-settled practice of the Supreme Court would have resulted in an order vacating our judgment and remanding the case for dismissal on the ground of mootness. *See United States v. Munsingwear, Inc.,* 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–07, 95 L.Ed. 36 (1950); *Bowen v. Kizer,* 485 U.S. 386, 108 S.Ct. 1200, 99 L.Ed.2d 402 (1988) (per curiam); *American Library Ass'n v. Barr,* 956 F.2d 1178 (D.C.Cir.1992).

If we published full opinions now, after the time for filing a certiorari petition has expired, we would be making pronouncements about the constitutionality of a repealed provision in a moot case with no possibility of Supreme Court review. To the extent that the opinions of at least two members of the panel agreed on any point, we would also be creating circuit precedent regarding questions of constitutional law. It is true that full exposition in written opinions guards against judicial decision-making by whim. But several of the reasons behind the mootness doctrine and the bar against rendering advisory opinions— "concern[ ] with the need to avoid unnecessary judicial lawmaking, and the fear that courts may be more prone to improvident decision when nothing immediate seems to be at stake" (13A C. WRIGHT, A. MILLER & E.

COOPER, FEDERAL PRACTICE AND PROCEDURE § 3533.1, at 218 (1984))—counsel strongly in favor of restraint.

Technically the case is not now before us. The only thing we have "jurisdiction" to do, because we reserved this in our judgment, is to expound further. Prudence leads us to refrain. As matters now stand, Local Rule 11(c) precludes citing as precedent either our judgment or the summary opinions accompanying it. In light of the statute's repeal, this is where matters should remain.

SILBERMAN, Circuit Judge, dissenting from the *per curiam* disposition:

As the majority recognizes, since no petition for *certiorari* has been filed (and our mandate has issued), our judgment holding an Act of Congress unconstitutional remains in place. I do not know why the majority claims the judgment has "no future effect"; it certainly constitutes *res judicata*. Although our order was "stamped" by the clerk's office "not to be published," that was only because we would issue fuller opinions later,[1] as we have done before in a situation where speed was essential. *See Central Vermont Ry. v. Brotherhood of Maintenance of Way Employees,* 793 F.2d 1298 (D.C.Cir. 1986).

I think we should honor our commitment to issue our full opinions, and, accordingly, I include a separate opinion which follows this dissent. We have already made a "pronouncement[ ] about the constitutionality" of an Act of Congress, a pronounce-

---

1. Accordingly, I herewith include the full judgment, issued on July 30, 1992:

ORDERED and ADJUDGED, by this Court, that 39 U.S.C. § 3210(d)(1)(B) is unconstitutional under the First and Fifth Amendments, and therefore the judgment of the District Court is hereby reversed. The provision at issue, 39 U.S.C. § 3210(d)(1)(B), part of the congressional franking statute, allows incumbents to send free mass mailings to persons in areas added to their districts by redistricting. Appellants, including several challengers running for seats in the upcoming elections, contest the law as an unconstitutional subsidy that aids incumbents at taxpayer expense in winning reelection. Appellees, officials of the House of Representatives, contend that the

law encourages incumbents to provide information to these redistricted voters, whose current representative may have less incentive to serve them because of redistricting. In a June 26, 1992 memorandum opinion and order granting appellees' motion for summary judgment, 796 F.Supp. 549, the District Court held that the justification for the law had a rational basis which survived constitutional scrutiny. On July 16 this Court granted appellants' motion for an expedited appeal.

A summary form of Judge Silberman and Judge Randolph's opinions concurring in the judgment are attached hereto, as well as a summary of Judge Wald's dissent. Expanded opinions will issue at a later date.

ment widely reported throughout the nation. Indeed, we issued our brief one page opinions with our judgment to give the House an adequate opportunity to seek Supreme Court review. The House of Representatives, however, immediately acquiesced in our judgment by discontinuing the challenged practice and by not seeking rehearing or *certiorari.* Congress also, as the majority *sua sponte* "take[s] judicial notice" of, repealed the statutory provision. Of course, the House's decision not to seek *certiorari* during the period allowed means that the Supreme Court has no opportunity to review our judgment or the reasoning supporting that judgment. That is a truism. But it hardly supports my colleagues' "prudential" determination not to more fully explain their reasoning.

I recognize, however, that if one or both of my colleagues were to switch their positions—expressed in their votes and brief supporting statements—and join my opinion, we would have an interesting question as to whether the reasoning set forth in my opinion would be precedential.[2] Resolving that question would depend on how we viewed the significance of the congressional repeal in a case in which no party seeks further review. Can we, in other words, add to the legal significance of our prior judgment after the case is (arguably) moot? It is fortunately an issue I do not have to confront since, as will be apparent to those who have received our statements, my view has not changed. Therefore, I feel free, and indeed obliged, to honor my commitment to fully explain my reasons for joining the judgment. My opinion, by itself, of course, cannot bind the court. But I issue it not only because of my commitment, but also because the single most important restraint on the decisions of judges is the tradition that we explain our decisions in writing. In this case, where it might be thought that Congress was inhibited politically from challenging

our judgment by seeking further review, I feel especially bound to fully explain my vote.

SILBERMAN, Circuit Judge:

Once every 10 years, reapportionment requires some congressmen to run for re-election in new districts that include voters the representatives do not currently represent. A provision in the congressional franking statute, 39 U.S.C. § 3210(d)(1)(B), permits incumbents to send mass mailings at taxpayer expense to these redistricted voters. Appellants, three public advocacy groups and five candidates for congressional office, challenge the statute as a discriminatory subsidy for incumbent candidates in congressional election campaigns.

Appellants seek reversal of a district court judgment holding that § 3210(d)(1)(B) has a rational basis and is therefore constitutional. Appellees, the House Commission on Congressional Mailing Standards and two officials of the House of Representatives, defend the law on the ground that it facilitates communication between congressmen and their would-be constituents. I believe the provision at issue violates the First and Fifth Amendments of the Constitution.

## I.

Congress enacted the provision at issue here as part of a 1973 overhaul of the congressional frank. The franking privilege allows congressmen to send mail, without prepaid postage, at taxpayer expense. The frank itself is a reproduction of the Member's signature which is affixed to the mailed item in lieu of a stamp. 39 U.S.C. § 3201(3). Throughout the history of the Republic (except for a short hiatus from 1873 to 1895), Congress has authorized use of the frank for "official business." *See Common Cause v. Bolger*, 574

---

**2.** Even a mooted decision that is not vacated still retains precedential value, since the very reason we vacate is to remove a decision's precedential effect. *See* 13A C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE 2d § 3533.-10, at 442–43 (1984). And even a vacated opinion, while no longer the law of the case, still

may carry "persuasive authority," *see Los Angeles v. Davis*, 440 U.S. 625, 646 n. 10, 99 S.Ct. 1379, 1391 n. 10, 59 L.Ed.2d 642 (1979) (Powell, J., dissenting), and even some precedential value, *see Action Alliance of Senior Citizens v. Sullivan*, 930 F.2d 77, 83 (D.C.Cir.1991).

F.Supp. 672,. 674 (D.D.C.1982), *aff'd mem.,* 461 U.S. 911, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983). The phrase "official business" naturally lent itself to wide, and sometimes rather imaginative, interpretations.[1] In the early 1970s, congressional candidates began challenging use of the frank during election campaigns, on the ground that the senders abused the privilege to further their reelection, rather than to conduct official duties. *See, e.g., Hoellen v. Annunzio,* 468 F.2d 522 (7th Cir.1972), *cert. denied,* 412 U.S. 953, 93 S.Ct. 3001, 37 L.Ed.2d 1006 (1973).

To forestall further lawsuits and even more flagrant abuses of the franking privilege, Congress enacted the Franking Act of 1973, Pub.L.. No. 93–191, 87 Stat. 737, codified as amended at 39 U.S.C. §§ 3201, 3210–19. The Act declared that the purpose of the frank is "to assist and expedite the conduct of the official business, activities, and duties of the Congress of the United States." 39 U.S.C. § 3210(a)(1). Congress defined official business as "all matters which directly or indirectly pertain to the legislative process or to any congressional representative functions generally or to the functioning, working, or operating of the Congress," and gave as examples "the conveying of information to the public, and the requesting of the views of the public." 39 U.S.C. § 3210(a)(2).

The revised statute authorizes mailings of the type at issue here, known as "postal patron mail," "mass mailings," or, in congressional jargon, "mail with a simplified form of address." 39 U.S.C. § 3210(d)(1). Senders of such mail do not need to place an individual's name and address on each letter. Instead, mass mailing allows the incumbent to. send identical pieces of mail to every address within a congressional district simply by addressing it to the "postal patron."

Appellants here challenge a particular provision of the statute that authorizes the use of mass mailings by congressmen who are running for reelection in redrawn districts. Section 3210(d)(1)(B) provides that a Member of the House may send franked mass mail not only to his current district, but also to "any additional area of each congressional district proposed or established" by redistricting and "containing all or part of" the Member's original district.[2] In essence, every 10 years the statute provides federal funding to incumbents to send mass mail to voters whom they do not yet represent, but who might vote for them come November.

Appellants filed this suit in the United States District Court for the District of Columbia against executive branch and congressional officials. They claimed that § 3210(d)(1)(B) violates the First and Fifth Amendment rights of voters and nonincumbent candidates to fair elections. After dismissing the suit against the executive branch officials, the district court granted the House defendants' motion for summary judgment. The court applied a rational basis test to § 3210(d)(1)(B) because it believed the provision did not engage in any content-based.discrimination against particular viewpoints. *Coalition to End the Permanent Congress v. Runyon,* 796 F.Supp. 549, 556 (1992). The court found that § 3210(d)(1)(B) advanced two legitimate government interests: first, "serv[ing] the public's desire to be informed and to communicate on policy issues that may follow redistricted lines," and second, "help[ing] avoid disputes among Members over the right to commu-

1. One of the more creative uses of the privilege occurred when a Member mailed his lawn furniture to Bimini in the Bahamas under the frank and a tag reading "official business." *Common Cause,* 574 F.Supp. at 674.

2. Section 3210(d)(1)(B) states:
   A Member of Congress may mail franked mail with a simplified form of address for delivery ... on and after the date on which the proposed redistricting of congressional districts in his State by legislative or judicial proceedings is initially completed (whether or not the redistricting is actually in effect), within any additional area of each congressional district proposed or established in such redistricting and containing all or part of the area constituting the congressional district from which he was elected, unless and until the congressional district so proposed or established is changed by legislative or judicial proceedings.

nicate with voters in a redistricted area." *Id.* at 557.

The appellants sought review of the district court's rulings on their First and Fifth Amendment claims before this court. We agreed to hear the case on expedited appeal since the franking statute requires Members to end their mass mailings 60 days before the election. 39 U.S.C. § 3210(a)(6)(A). Because the statute, which operates only in an electoral context, provides financial assistance to incumbents against major-party challengers, I believe it to be unconstitutional.

## II.

It is not immediately apparent how this case implicates the First and Fifth Amendments to the Constitution. The statute hardly burdens speech; by financing speech, it actually encourages it. *See, e.g., Rust v. Sullivan,* — U.S. —, — - — & n. 5, 111 S.Ct. 1759, 1774–75 & n. 5, 114 L.Ed.2d 233 (1991). Although the challengers assert they are discriminated against and thus denied the benefits of the Equal Protection component of the Fifth Amendment, it is more difficult to see how the voters *en masse* have any claim under that constitutional provision. But recent Supreme Court cases have developed a rather general, if imprecise, notion that voters and candidates have a "fundamental right" under the First and Fourteenth (or Fifth) Amendments—independent of the Equal Protection guarantee—which can be abridged by laws affecting elections that favor some candidates over others. *Anderson v. Celebrezze,* 460 U.S. 780, 786–89 & n. 7, 103 S.Ct. 1564, 1568–70 & n. 7, 75 L.Ed.2d 547 (1983). And the Supreme Court has made clear that in analyzing alleged violations of this fundamental right, we need not distinguish the claims of the challengers from those of the voters. *See id.* at 786, 103 S.Ct. at 1568.

The major issue in the case—at least as framed by the parties—is the standard of inquiry we should apply to the statute before us. Do we ask only whether the statute has a rational basis or do we ask whether it is to be judged by some level of heightened scrutiny? In my view, this question is decisive because I agree with appellees and the district court that the statutory provision has a "rational basis." In *Common Cause v. Bolger,* 574 F.Supp. 672 (D.D.C.1982), *aff'd mem.,* 461 U.S. 911, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983), Judge Pratt, speaking for the three-judge district court, explained the legitimate (and historical) basis for the congressional frank—that it serves to inform "constituents" of the workings of Congress and their congressmen. *See id.* at 682. I think it is also "rational" for Congress to be concerned that, after redistricting, those persons who are presently represented by Congressman "X" in District "A," but who will be part of a new District "B" in which Congressman "X" will not be running will hardly be a major target of Congressman "X's" attention. They could be thought to have been "orphaned" by the redistricting. To be sure, Congress necessarily assumed that a congressman's desire to be reelected is a major (perhaps the major) impetus to constituent service, but that assumption is hardly irrational. Therefore, I cannot disagree that these "orphaned constituents" will be better served if Congressman "Y," to whose present district they are added, can send them franked communications. The disputed provision "rationally further[s] a legitimate state interest." *Nordlinger v. Hahn,* — U.S. —, — - —, 112 S.Ct. 2326, 2331–32, 120 L.Ed.2d 1 (1992).

Appellees would have us stop at that point. They contend that *Common Cause,* which was summarily affirmed by the Supreme Court, holds that any congressional use of the frank is to be measured solely by the rational basis test. The district court agreed, but I do not. In *Common Cause,* the court considered only the general franking statute by which congressmen communicate with their constituents throughout their term. Although "the franking privilege confers a substantial advantage to incumbent congressional candidates over their challengers," *Common Cause,* 574 F.Supp. at 679, heightened scrutiny would have been inappropriate because the general franking statute's general pur-

pose—facilitating communication with constituents—was analytically independent of the electoral context. Even so, the court reserved the question whether the frank's use would be unconstitutional if it were "shown to be available and widely used for reelection purposes." *Id.* at 682.

The particular provision of the franking statute presented in this case has no significance independent of an election context. Redistricting, following the decennial census, draws new electoral boundaries in contemplation of the next congressional election. And the "orphaned voters" are not yet (and may never be) the constituents of Congressman "Y." Indeed, the very justification that appellees put forward for the statutory provision—that Congressman "Y" will have a significantly greater incentive to serve the orphaned voters than Congressman "X" because of the incentive of reelection—only serves to highlight the electoral context in which the provision operates. It seems to me that *Common Cause* does not resolve the level of scrutiny because of the relationship between this special provision of the franking statute and the electoral process.

Appellants argue that this case is governed by a line of Supreme Court cases that apply heightened scrutiny to state laws which directly regulate elections. *See Burdick v. Takushi,* —— U.S. ——, ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (Hawaii prohibition on write-in voting); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 214, 107 S.Ct. 544, 213, 93 L.Ed.2d 514 (1986) (Connecticut law prohibiting independents from voting in Republican primaries); *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983) (Ohio early filing deadlines); *Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) (minimum support requirement for placement on ballot). Those cases are not directly controlling because they all dealt with state schemes that arguably infringed on a political party or non-party group's freedom to participate in an election. But they do show that the Supreme Court treats laws operating only in an electoral context as deserving of careful examination.

The only Supreme Court case that explores the constitutionality of government subsidies to candidates is *Buckley v. Valeo,* 424 U.S. 1, 90–109, 96 S.Ct. 612, 668–78, 46 L.Ed.2d 659 (1976) (per curiam). The federal campaign laws, challenged in that case in large part because of their restrictions on campaign contributions and expenditures, also provide funding for the candidates in presidential campaigns. Only "major" party candidates—those who represent parties that received more than 25% of the vote in the most recent election—receive full funding. Appellants in *Buckley* challenged that portion of the statute because it unconstitutionally discriminated against the non-major parties. In considering that challenge, the Court evidently, although without quite saying so, applied heightened scrutiny. It remained for Justice Rehnquist in a separate opinion to call explicit attention to the standard used. "[B]ecause of the First Amendment overtones of the appellants' Fifth Amendment equal protection claim, something more than a merely rational basis for the difference in treatment [between major party and minor party funding] must be shown...." *Id.* at 293, 96 S.Ct. at 761 (Rehnquist, J., concurring and dissenting in part).

The majority opinion did sustain the constitutionality of that portion of the statute (without which, as a practical matter, the whole statutory scheme would have collapsed), but it did so only after a careful consideration of the impact of the discriminatory subsidy on American politics. "Since the Presidential elections of 1856 and 1860," the Court noted, "no third party has posed a credible threat to the two major parties in Presidential elections." *Id.* at 98, 96 S.Ct. at 672. Because of "this fact of American life," the Court held, Congress "was justified in providing both major parties full funding and all other parties only a percentage of the major-party entitlement." *Id.* However, the Court suggested that a funding scheme that assisted only incumbents and not their major-party challengers might be suspect:

Appellants suggest that a less discriminatory formula would be to grant full funding to the candidate of the party getting the most votes in the last election and then give money to candidates of other parties based on their showing in the last election relative to the "leading" party. *That formula, however, might unfairly favor incumbents, since their major-party challengers would receive less financial assistance.*

*Id.* at 98 n. 133, 96 S.Ct. at 673 n. 133 (citation omitted) (emphasis added); *see also id.* at 31 & n. 33, 96 S.Ct. at 641 & n. 33.

Embedded in the Court's discussion is the notion that the very nature of American constitutional democracy requires that voters be able to choose freely between at least two viable parties or candidates. Therefore, when the government seeks to favor one major-party candidate against another, the Court will look closely at the government's justification. Perhaps our Constitution was inevitably so interpreted. I dare say that even if the Bill of Rights had not been adopted, the Supreme Court of Chief Justice Marshall's time would have relied on other provisions of the original Constitution to subject § 3210(d)(1)(B) to careful scrutiny. It would have seen government support for one major-party candidate against the other, or direct subsidies to incumbents for campaign purposes, as threats to republican democracy itself.[3] In any event, in the aftermath of *Buckley v. Valeo*, it seems clear to me that legislation providing such advantages are subject to heightened, if not strict, scrutiny.

The more difficult question is how to draw the line between legislation—like the general franking statute—with a core nonelectoral purpose and a statute which explicitly provides funds to an incumbent for campaign purposes. In other words, how does a court decide which statute should be thought "electoral" and thus subject to heightened scrutiny? It seems to me that a statute that provides a subsidy to incumbents directly *in contemplation of an election*, regardless of its stated purpose, must receive heightened scrutiny. If the law were otherwise, Congress could provide an illegal subsidy to incumbents merely by labeling the subsidy a technique to serve constituents. Thus, Congress might temporarily increase congressional travel allowances or telephone subsidies, or grant large amounts of money to incumbents, all for the purpose of "communicating with constituents" during a period leading up to an election. In those circumstances, the judiciary must ask more than whether such schemes have a rational basis, because that test would uphold any statute that includes *some* benefits to constituents apart from the electoral advantages bestowed on incumbents. Any plan to provide financial advantage to incumbents could be so justified. In this case, I find that § 3210(d)(1)(B) acts in contemplation of elections because on its face it is triggered *only* by the redistricting that precedes elections. It is no different than a statute increasing the benefits of incumbency for the three months before an election, because § 3210(d)(1)(B) takes effect only after redistricting and becomes inapplicable 60 days before the election. By timing the provision of a financial advantage to incumbents to coincide with elections, the statute must face heightened scrutiny.

### III.

Given that the statutory provision in question is subject to heightened scrutiny, the conclusion that the legislation is unconstitutional follows ineluctably. When using heightened scrutiny we must weigh "the character and magnitude of the asserted injury to the rights protected by First and [Fifth] Amendments" against

---

**3.** Just as John Marshall inferred the existence of judicial review in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), by relying only on the structure of the Constitution, so also he might have found an implicit constitutional requirement that the federal government be a republican one. The framers necessarily as-

sumed the federal government would be republican in form when they sought to guarantee that the state governments would be republican as well. *See* U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government.").

"the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into account "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983); *see also Burdick v. Takushi*, —— U.S. ——, ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986); *Buckley v. Valeo*, 424 U.S. 1, 93–97, 96 S.Ct. 612, 670–72, 46 L.Ed.2d 659 (1976).[4]

The appellants have demonstrated an injury to their rights under the First and Fifth Amendments. Appellees did offer expert testimony showing that mass mailings do not contribute an important or decisive advantage in elections. Appellees also argue that anti-incumbent feelings among the electorate or economic trends greatly overshadow any effect franked mass mailings might have. This led the district court to conclude that "there has been little showing that the injuries suffered by members of the plaintiff group were caused by the operation of the frank." *See Coalition* at 558 n. 8. I rather doubt, however, that any court can measure the prospective impact of a government campaign subsidy to an incumbent (or any candidate). I think we must assume that the subsidy provides an advantage to the recipient equal to its economic value, and no one has suggested that the frank's value per potential voter to a congressional campaign is insignificant.

To justify § 3210(d)(1)(B)'s interference with the appellant's constitutional rights, the government asserts an interest in promoting communication with orphaned constituents. Although this is surely a legiti-

mate goal, the government fails to demonstrate that this "interest[ ] make[s] it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570. The government could ensure congressional communication with the orphaned constituents without compromising the appellants' rights. The general franking statute permits a congressman to send franked mail to all his current constituents—both the orphans and those who will remain in his district. *See* 39 U.S.C. § 3210(d)(1)(A). If Congress is concerned that congressmen will neglect constituents who cannot reelect them, it can simply require that any mass mailings that a congressman sends back to his home district must go to the entire district—orphans and electors alike. Like § 3210(d)(1)(B), this requirement would harness the energy with which congressmen seek reelection to serve the needs of orphans, but it would do so in a manner that does not interfere with rights guaranteed by the First and Fifth Amendments. Section 3210(d)(1)(B) is unconstitutional because the appellees cannot demonstrate any legitimate interest which requires infringing constitutional rights.[5]

---

**4.** Although *Buckley* is imprecise as to the scope of review, once we go beyond rational basis, we are perforce at heightened scrutiny.

**5.** Appellants brought to our attention that the House voted for a second time to repeal § 3210(d)(1)(B) by an overwhelming vote of 417–2. And, as the majority notes, the full Congress passed the repeal, which was signed by the President on October 6, 1992. Of course, we cannot consider such actions of a subsequent Congress as bearing on our interpretation of the original statute. But it may well undercut the

argument that the original legislation had a substantial government purpose. Because the House is the real party represented in this litigation, it has the obligation to show that the original legislation had a substantial governmental purpose sufficient to meet heightened scrutiny. I do not think, in this context, we must ignore the only explanation given by *any* member for the vote to repeal § 3210(d)(1)(B). That provision was described as a "taxpayer financed, indirect way to campaign at taxpayer expense." 138 Cong. Rec. H5146 (daily ed. June 24, 1992).