Sal F. ALBANESE, et al., Plaintiffs,

v.

The FEDERAL ELECTION COMMISSION, Hon. Susan Molinari, Committee To Re–Elect Susan Molinari, Defendants.

No. CV–94–3299.

United States District Court, E.D. New York.

April 17, 1995.

John C. Bonifaz, Jamin Raskin, Law Offices of Cristobal Bonifaz, Boston, MA, for plaintiffs.

Stephen Hershkowitz, Federal Election Com'n, Charles Tiefer, Office of the General Counsel, U.S. House of Representatives, Washington, DC, Richard F. Birmingham, Cause & Birmingham, Staten Island, NY, for defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

### BACKGROUND

#### Plaintiffs' Claims and Relief Sought

Plaintiffs have brought this action to challenge the constitutionality of various aspects of the current system through which congressional elections are financed. They denote the system they challenge the "wealth primary," and base their case upon the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, and Article I, Section 2 of the United States Constitution.[1] Specifically, plaintiffs' challenge the existing laws which structure the way in which public and private funds are accumulated and used by incumbent members of the House of Representatives in seeking re-election. They define the "wealth primary" as:

> "the exclusionary campaign finance process in federal elections which heavily favors incumbents, wealthy candidates, and candidates backed by affluent supporters and monied interests and which, simultaneously, prevents potential office seekers lacking personal wealth or affluent backers from competing effectively for political office."

Complaint ¶ 2. In this action, plaintiffs have explicitly challenged the constitutionality of the Federal Election Campaign Act of 1971, 2 U.S.C. § 431 *et seq.* ("FECA"), and the authorization of funds for the congressional franking of mail, 39 U.S.C. § 3210. They seek the following declaratory relief: (1) the invalidation of the wealth primary in the 13th Congressional District for the State of New York; (2) the invalidation of the FECA insofar as it allows for the use of private monies in federal elections; (3) the invalidation of the franking statute unless and until equal funds are appropriated for qualified challengers to incumbent federal office holders; and (4) that members of the United States Congress be declared to be acting as private citizens when engaged in activity as a candidate, and that the government may not provide that member with a subsidy that is not shared equally by other candidates for that office.

#### Parties to the Action

All of the plaintiffs are registered voters residing in the 13th Congressional District of the State of New York. Plaintiff Albanese, a New York City Councilman, was the 1992 Democratic Party congressional candidate for the 13th District. He lost that election to Defendant Molinari who continues to represent the 13th District in the House of Representatives. Plaintiff Carl considered running for congress from the 13th District as an independent candidate in 1992, but chose not to because he did not believe he could raise the funds necessary to run effectively. The various other plaintiffs in this action are individuals who voted for Plaintiff Albanese in the 1992 election, some of whom worked on his campaign as volunteers.

As mentioned above, Defendant Molinari is the current Representative for the 13th District, re-elected for her third term in 1994. Defendant Committee To Re–Elect Susan Molinari (the "Committee") is the entity through which money was raised and spent for Rep. Molinari's campaigns. Defendant Federal Election Commission ("FEC") is the agency established by the FECA to interpret and enforce the provisions of that statute.

#### Facts

The facts underlying this action are uncontested by the parties. As previously mentioned, Plaintiff Albanese was the 1992 Democratic congressional candidate for the 13th District. In the course of that campaign, he raised $267,248 in support of his candidacy from political action committees and individuals. Rep. Molinari, the victorious Republican candidate, and the Committee raised $524,112 in support of her re-election from groups and individuals. Rep. Molinari utilized various campaign tools, such as television advertisements and district wide mailings, that her challenger claims he could not afford. Defendants concede that Rep. Molinari, as an incumbent, lawfully utilized franked mail and her office staff, in manners consistent with

---

1. Plaintiffs cite the following language from that section: "The House of Representatives shall be composed of Members chosen ... by the People of the several States."

their respective restrictions. In the election, Ms. Molinari received 55% of the vote to 39% for Plaintiff Albanese. There is no claim that this election did not comply with the FECA and other campaign laws, or that the FEC did not discharge its responsibilities in that regard.

In the 1994 election cycle, Plaintiff Albanese chose not to challenge Rep. Molinari again because he believed he could not raise the funds necessary to mount an effective campaign. The other plaintiffs in this action wished to support Plaintiff Albanese's candidacy but could not do so in 1994 due to his decision not to run for office.

The defendants have brought these motions to dismiss the complaint with respect to the claims raised against each of them, respectively.[2] Each defendant contends that plaintiffs' complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, asserting that plaintiffs lack standing to maintain this action, and Fed.R.Civ.P. 12(b)(6) that the complaint fails to state a claim upon which relief can be granted.

## DISCUSSION

### Standards Under Rule 12(b)

At the outset it is important to note the standards for determining these motions. When deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must take all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Ortiz v. Cornetta,* 867 F.2d 146, 149 (2d Cir. 1989). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).

However, with regard to a motion pursuant to Rule 12(b)(1), which questions the jurisdiction of a court to entertain the action, the standard may be different. As one court aptly noted recently:

Rule 12(b)(1) motions to dismiss based upon [lack of] subject matter jurisdiction generally come in two varieties. A *facial* attack ... merely questions the sufficiency of the pleading. In reviewing such a facial attack, a trial court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss. On the other hand, when a court reviews a complaint under a *factual* attack ... no presumptive truthfulness applies to the factual allegations ... When facts presented to the district court give rise to a factual controversy, the district court must ... arrive at the factual predicate that subject matter jurisdiction exists or does not exist.

*Ohio Nat. Life Ins. Co. v. U.S.,* 922 F.2d 320 (6th Cir.1990); *see also* Wright & Miller, 5A *Federal Practice and Procedure* §§ 1350, 1364; *United Transp. Unions 385 & 77 v. Metro North Commuter,* 862 F.Supp. 55, 57 (S.D.N.Y.1994). This discussion will first address defendants' motions pursuant to Rule 12(b)(1) and then turn to their claims under Rule 12(b)(6) in the context of each aspect of plaintiffs' action.

### The Requirement for Standing—Generally

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.' As the [Supreme] Court explained in *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–476, 102 S.Ct. 752, 757–761, 70 L.Ed.2d 700 (1982), the 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers upon which the Federal Government is founded." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The Court in *Allen* adopted Judge Bork's concurring opinion in *Vander Jagt v. O'Neill,* 699 F.2d 1166,

---

**2.** FEC has addressed the challenge to FECA in its motion to dismiss, while Rep. Molinari, through the House of Representatives Office of the General Counsel, has addressed the challenge to the franking statute and other Member privileges. The Committee to Re–Elect has joined in the papers submitted by the House of Representatives Office of the General Counsel.

1178 (D.C.Cir.), *cert. den.* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), as follows:

> All of the doctrines that cluster about Article III—not only standing but mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

468 U.S. at 750, 104 S.Ct. at 3324. After observing that the "case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government" and that "standing" is perhaps the most important of these doctrines, the Court wrote:

> The Art. III doctrine that requires a litigant to have "standing" to invoke the power of a federal court is perhaps the most important of these doctrines. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." ... Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction ... such as ... the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked ... The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief....
>
> Like the prudential component, the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition. The injury alleged must be ... "distinct and palpable" ... and not "abstract" or "conjectural" or "hypothetical" ... The injury must be "fairly" traceable to the challenged action,

and relief from the injury must be "likely" to follow from a favorable decision ... These terms cannot be defined so as to make application of the constitutional standing requirement a mechanical exercise.

> ... Typically ... the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative? These questions and any others relevant to the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity" ... and only when adjudication is "consistent with system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process"....

*Allen,* 468 U.S. at 751–752, 104 S.Ct. at 3324–3325 (citations omitted); *see also,* 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Prac. & Procedure* § 3531.[3]

Before turning to the parties' contentions and the case law addressing this traditional standing analysis, this Court must address an aspect of standing analysis unique to a case brought to challenge the FECA. Section 437h(a) of that Act provides:

> The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionali-

---

3. This Court is also obliged to determine whether plaintiffs have standing to maintain this action since they seek declaratory relief which may be rendered by this Court only "in a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201 *et seq.; see Stronko v. Bergin,* 843 F.Supp. 827 (N.D.N.Y.1994).

ty of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

At first blush, this section seems to grant standing to the three enumerated classes to challenge the constitutionality of FECA provisions. However, the Supreme Court has consistently held that this section is bounded by the limits of Article III standing requirements. "Congress may not," the Court stated, "require [a federal court] to render opinions in matters which are not 'cases or controversies.' *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937) . . . It is clear that Congress, in enacting [section] 437h, intended to provide judicial review to the extent permitted by Article III." *Buckley v. Valeo,* 424 U.S. 1, 11–12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1975); *see also California Medical Assn. v. FEC,* 453 U.S. 182, fn. 6, fn. 14, 101 S.Ct. 2712, fn. 6, fn. 14, 69 L.Ed.2d 567.[4] Thus, this discussion must return to the traditional standing analysis. For the sake of clarity, I will first address the issue of standing to challenge the FECA and campaign contributions and then turn to plaintiffs' standing to challenge the franking statute and other activities of the incumbent Representative.

*Standing to Challenge the FECA*

It is important to note that what the FECA seeks to accomplish is to "limit the actuality and appearance of corruption resulting from large individual financial contributions" to political candidates. *Buckley,* 424 U.S. at 26, 96 S.Ct. at 638. The Act attempts to achieve this goal by limiting the amount of money any individual or PAC[5] can contribute to a candidate or her campaign committee, 2 U.S.C. § 441, and by mandating reporting requirements for receipts and disbursements of political committees, § 434.

Past challenges to the FECA have been principally based upon the First Amendment on the ground that limitations upon political contributions are an impermissible restriction of free speech. Such challenges have been directly rejected by *Buckley* and its progeny. Plaintiffs in this action challenge the FECA principally on the basis of the Equal Protection clause.[6] They invoke the line of cases that have ensured equal access to the voting process and the principle of one person/one vote—*e.g. Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). In each of these cases, the plaintiffs were granted standing to seek redress of the injury to their franchise and, relying upon those cases, plaintiffs seek standing to do so here.

Defendant FEC contends that the plaintiffs fail to meet the three part standing test which requires plaintiffs to identify (1) an actual injury that is (2) caused by the challenged act and (3) likely to be redressed by the relief requested. More specifically, FEC asserts that Albanese suffered no actual injury in the fact that Albanese was unable to raise more funds in support of his 1992 candidacy nor in the fact that he decided not to run in 1994. Nor is there an actual injury suffered by the plaintiffs who supported Albanese's failed 1992 candidacy and did not have the opportunity to support and vote for him in 1994. FEC further asserts that these alleged injuries cannot be traced to the FECA as their cause. Rather than mandating that contributions be made to any candidate, the statute limits the amounts of contributions that may be made. Thus, plaintiffs'

---

4. In *Bread Political Action Committee v. FEC,* 455 U.S. 577, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982), the Court read § 437h as a *restriction* upon who was eligible to challenge FECA provisions, holding only the enumerated classes and not PACs nor trade associations may sue under this section.

5. The contributions of other entities may be limited as well. *See* FECA § 441b; *Austin v. Michi-*

gan *Chamber of Commerce,* 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990).

6. Plaintiffs also invoke Article I, Section 2 as interpreted by *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1963). This, too, was a malapportionment case and its treatment is consistent with the analysis which follows.

asserted injury is best attributed to Albanese's own decision not to run for office and not the FECA. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992). Lastly, to grant the declaratory judgment that plaintiffs seek would eliminate the contribution limits established by the Act, would not provide funds for challengers to incumbents and would not prohibit private contributions since the FECA does not authorize them. Thus, contends FEC, the requested relief would not redress the alleged injury.

In response, plaintiffs contend they do meet the three part standing test to challenge the FECA. They claim they have suffered an actual injury. Specifically, they assert that they are excluded from an "integral part of the election process"[7]—the wealth primary—and that this exclusion is by virtue of their economic status and, therefore, prohibited by cases such as *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (declaring an exclusionary ballot registration fee unconstitutional). *See also Lubin v. Panish,* 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). In addition, plaintiffs contend that they suffer injury in that their right to vote is "debased" in manners found unconstitutional in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and its progeny which struck down malapportioned voting districts under the Equal Protection clause. They contend that their votes are debased by virtue of a "system" which allows wealthier interests to make contributions to office holders and, thereby, gain increased access to exert their influence with those officials.

Plaintiffs insist their injury is traceable to the FECA and the FEC. They emphasize that the current regime of campaign financing exists by virtue of the FECA and the FEC, its enforcement arm. In support of this position, plaintiffs point to the fact that, as a federal statute, the FECA preempts any state laws that might conflict with its provisions.

Lastly, plaintiffs contend that their injury will be redressed by the relief sought. They contend that they only ask this Court to declare the FECA unconstitutional insofar as it allows for the solicitation and use of private monies in federal elections, and it will then be the responsibility of the United States Congress to react appropriately to the judgment and pass responsive legislation.[8]

---

7. In support of this position, plaintiffs have submitted the Affidavit and supporting exhibits of Ellen Miller of the Center for Responsive Politics which purports to demonstrate the correlation between success in fund raising and winning congressional elections.

8. A careful consideration of the preceding arguments advanced by plaintiffs and FEC leads to the following conclusion: At the heart of plaintiffs' challenge to the FECA and the question of their standing is the relationship between law, or its absence, and the status quo. One of the lasting impacts of the Legal Realist movement was its attack upon the theory that the absence of legislation and the reliance on free markets constitutes government neutrality. This theory was at the heart of the pre-New Deal jurisprudence most famously reflected in *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), in which the Supreme Court invalidated maximum hour labor laws. Regulatory adjustment of free market arrangements was viewed as an improper interference with an otherwise neutral status quo. This view collapsed during the years of the New Deal when it came to be believed that existing distributions of wealth and resources were as much a product of government's decision not to act as it was when government did

act. *See* M. Horwitz, *The Transformation of America Law; 1870–1960* (1992).

Interestingly, one commentator has noted that the premises of *Buckley v. Valeo's* free speech analysis—insisting that the FECA's campaign expenditure limits were unconstitutional as interfering with the "free market" distribution of free speech—are similar to the premises underlying *Lochner. See* Sunstein, *Political Equality and Unintended Consequences,* 94 Col.L.Rev. 1390, 1397 (1994). So too, at the heart of plaintiffs' theory is the notion that the present free market distribution of resources expended on congressional campaigns is structured by the FECA. (This is most clearly revealed by the fact that the statute plaintiffs challenge does not legislate a requirement for individuals to contribute to political candidates; it *limits* the amounts that may be contributed.) Therefore, the plaintiffs would hold, challenging the FECA, whether in its entirety or insofar as it relates to private contributions, is appropriate. The absence of laws prohibiting the solicitation and use of private funds or, alternatively, the absence of laws providing equal funding to rival candidates is what plaintiffs challenge via their action against the FECA. While this theory is intriguing, this Court is bound to apply the legal principles and analysis which follows.

■ The federal courts of the United States are inherently courts of limited jurisdiction which adjudicate actual cases and controversies. They cannot and may not, therefore, serve as the forum to challenge the absence of a debatably desired piece of legislation for there could be nothing more abstract and theoretical. Such concerns have been reserved by the Constitution to the political branches of our government. Thus, *Buckley v. Valeo* remains the binding and informative precedent for this Court.

■ In *Buckley*, the Supreme Court held that the plaintiffs had standing to challenge the FECA, in light of traditional standing analysis, because they had "a personal stake" in a determination of the constitutionality of the statute. The plaintiffs in *Buckley* were actual candidates for election and re-election as well as their potential contributors. In this case, the plaintiffs are a potential candidate who decided not to run and his would-be supporters. These facts clearly make the alleged injury more remote than that alleged in *Buckley*. Moreover, to the extent that they allege a more generalized harm, that they are a few of the "vast majority of the American people [who] lack the means to make large financial contributions to candidates running for the United States Congress," Plaintiffs' Exhibit 1 at 6, a finding of standing is less appropriate as *Allen v. Wright* clearly indicates:

> Standing doctrine embraces several judicially self-imposed limits ... such as ... the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches ...

468 U.S. at 751, 104 S.Ct. at 3324.

The alleged harm of exclusion from what plaintiff asserts is an integral aspect of the electoral process is, at least at this stage of its jurisprudential life, abstract and conjectural. This can best be seen by comparing this case to one in which standing was found on the basis of a more discernable injury, *Fulani v. League of Women Voters Education Fund*, 882 F.2d 621 (2d Cir.1989). In that case, actual injury was found in the fact

that a third party candidate was deprived of the exposure to be derived from participating in a televised presidential debate. The alleged injury was definable and easily linked to the other steps of the standing analysis. In this case, an injury has been posited that is too remote from its suggested cause. The FECA's contribution limits cannot be directly traced to be the cause of Albanese's decision not to run for Congress in the face of an expected lack of financial support for his undeclared candidacy.

In a similar fashion, plaintiffs' case is distinguishable from the malapportionment cases they seek to rely upon. Those cases dealt with the dilution of votes based upon a measurable population disparity between districts, thereby diluting the "value" of the plaintiffs' votes with respect to their elected representative under a one person/one vote formula. Here, plaintiffs are not suggesting that their votes are diluted on the basis of the number of citizens represented, but that their influence with their Representative is diminished since they could (or would) not contribute financially to that person's campaign and might, therefore, have less access or influence than a hypothesized wealthy contributor. Again, this claimed injury is abstract and remote in comparison to those in the precedents cited in its support.

Plaintiffs' case is also distinguishable from the filing fee cases. In those cases a candidate seeking to run for office was actually excluded by, typically, an insurmountable filing fee. In the instant case, Plaintiff Albanese was a candidate in 1992 and personally chose not to be a candidate in 1994. If the campaign finance regime affected these events in some manner it is too remote to permit a finding of actual injury traceable to the FECA to give standing to the plaintiffs.[9] *See Lujan*, 504 U.S. at 563, 112 S.Ct. at 2138; *cf. In re U.S. Catholic Conf.*, 885 F.2d 1020, 1030 (2d Cir.1989), *cert. den.* 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990). In the final analysis, Albanese opted not to par-

9. The parties debate the presence or absence of "state action" with regard to this point. Whether or not state action would be found underlying

the financing regime, its relationship to plaintiffs' case is still too remote.

ticipate in the election process; he was not prevented from doing so.[10]

The last point to be made with respect to plaintiffs' standing to challenge the FECA is in connection with the question of likelihood of redress. The suggestion that this Court is being asked *merely* to declare the FECA unconstitutional insofar as it permits private monies to be used in federal elections and then it will be left to Congress to respond with appropriate legislation is not persuasive. In the context of the foregoing discussion of the abstract nature of the alleged injury, this Court would be simply ignoring its limited authority and the bedrock concept of separation of powers underlying the Constitution and the doctrine of standing if it were to enter such a declaratory judgment. Moreover, if plaintiffs' goal is to eliminate the contribution of private funds to politicians and thereby level the electoral playing field, declaring the FECA—a statute which *limits* such contributions—unconstitutional cannot be said to redress plaintiffs' injury.

In light of the foregoing analysis, plaintiffs cannot be deemed to have standing to bring their action against the FECA. Thus, defendants' motions to dismiss this claim pursuant to Rule 12(b)(1) will be granted.

*The FECA and Fed.R.Civ.P. 12(b)(6)*

■ In addition to the foregoing analysis which requires that plaintiffs' action be dismissed under Rule 12(b)(1), it is also appropriate to note that defendants' motions may be granted for plaintiffs' failure to state a claim upon which relief may be granted. Plaintiffs have challenged the constitutionality of a federal statute which has been previously challenged and found, in well reasoned and persuasive opinions, to be constitutional.

The constitutionality of the FECA was squarely addressed by the United States Supreme Court in *Buckley v. Valeo, supra.* The Court's concern in *Buckley* was, principally, the limitation upon free speech rights inherent in the contribution limits. Because

of First Amendment concerns the Supreme Court rejected that portion of the statute which placed limits upon the use of a candidate's personal funds and overall campaign expenditures. 424 U.S. at 39–59, 96 S.Ct. at 644–654. The Court's reasoning in *Buckley* suggests that the essence of plaintiffs' challenge to the FECA has been considered and rejected by the Supreme Court.[11] This Court, in obedience to that precedent must dismiss the challenge to the FECA for failure to state a claim upon which relief may be granted.

*Standing to Challenge the "Incumbent Subsidy"*

■ In addition to challenging the FECA, plaintiffs challenge what they refer to as the "incumbent subsidy." Under this heading they include the franking privilege as well as other benefits of incumbency which may aid the re-election efforts of the official such as an office staff and public salary. I will address the latter point first and return to the franking statute.

As mentioned at the outset of this Memorandum, plaintiffs seek a declaratory judgment that

> whenever a Member of the U.S. Congress engages in activity as a candidate for public office, he or she is acting as a private citizen and . . . that, therefore, it is unconstitutional . . . for the U.S. government to provide politically valuable public subsidies to such a candidate that are not shared equally by all other candidates for that office.

The plaintiffs do not define with specificity the activities to which they refer except to mention the use of a press secretary, scheduling assistant, and public salary. Such a claim may founder upon its generality and vagueness alone and require, at a minimum, that it be repleaded with sufficient particularity. However, in light of the prudential considerations raised by this claim this Court can reach a conclusion that it should be dismissed.

---

**10.** We will never know how much money might have been contributed to an Albanese–For–Congress–'94 campaign and how successful he might have been at the polls in that tumultuous election season.

**11.** *Plaintiffs admit as much when they state in their complaint, at fn. 5, that they "ask this Honorable Court to reconsider the U.S. Supreme Court's 1976 holding in Buckley v. Valeo . . ."*

Although the precise boundaries of the political-question doctrine are obscure, prominent considerations in defining those boundaries are:

a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government ...

*Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710. Some, if not all, of these factors are present here and require the dismissal of this aspect of plaintiffs' complaint on political-question doctrine grounds.

In Article I, Section 5 of the Constitution, one might find a textual commitment of this issue to the legislature in that "[e]ach House may determine the Rules of its Proceedings [and] punish its Members." This is precisely the case with regard to defining what is official and what is personal activity. Consistent with its responsibility for regulating the activities of its Members, the House issues the House Ethics Manual and maintains the House Ethics Committee to oversee, *inter alia,* that Members properly respect the boundary between appropriate official and personal activities. Additionally, the Office of the General Counsel regularly advises Members on ethical issues. An attempt by this Court to draw the line between official and personal conduct of Members would entail a policy determination of a kind peculiarly suited to the exercise of legislative rather than judicial discretion.

Moreover, for this Court to ignore this constitutional separation of powers and become entangled in the micromanagement of the conduct of Representative Molinari and all other incumbent Members would violate the political-question doctrine and be an affront to the coordinate legislative branch. *See U.S. ex rel. Joseph v. Cannon,* 642 F.2d 1373 (D.C.Cir.1981); *cf. Winpisinger v. Watson,* 628 F.2d 133 (D.C.Cir.), *cert. den.* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980). Thus, it must be rejected.

Unlike their vague challenge to Members' official/personal practices, plaintiffs have stated a specific challenge to the franking statute; namely, that it grants incumbents an unfair advantage toward re-election in violation of the First and Fourteenth Amendments. A series of opinions in the District of Columbia have addressed the constitutionality of the franking statute and standing to bring such challenges. *See Common Cause v. Bolger,* 512 F.Supp. 26 (D.D.C.1980); *Common Cause v. Bolger,* 574 F.Supp. 672 (D.D.C.1982) *aff'd* 461 U.S. 911, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983); *Coalition To End The Permanent Congress v. Runyon,* 979 F.2d 219 (D.C.Cir.1992); *Virginians Against a Corrupt Congress v. Moran,* 805 F.Supp. 75 (D.D.C.1992). Those opinions offer a thorough review of the history and purpose of the franking statute.

In *Common Cause* and *Runyon,* plaintiffs were granted standing to bring their challenge while in *Moran* the court insisted plaintiffs first turn to the House Commission on Congressional Mailing Standards. The *Runyon* and *Moran* cases are distinguishable from this case for they were not challenges to the franking statute as a whole, but to a specific section of the statute (repealed by Congress during the course of the litigation) which allowed an incumbent to mail franked material to citizens who were subsequently to become constituents through district reapportionment. The *Common Cause* proceedings challenged the statute as a whole and, therefore, analogously inform this case as well.

Central to the panel's analysis in *Common Cause* were the facts that the plaintiff organization was composed of members who were actual candidates for elective office as well as actual contributors and campaign workers for those candidates. In this case, the plaintiffs are a would-be candidate who chose not to run and his supporters whose possible actions on his behalf were frustrated by his decision not to run. It is reasonable to suggest that on this basis plaintiffs challenge to the frank should be dismissed for lack of standing as was their challenge to the

FECA. However, even if one were to suggest that standing should be granted, plaintiffs' case must be dismissed for failure to state a claim upon which relief may be granted.

*The Frank and 12(b)(6)*

█ In *Common Cause* the gravamen of plaintiffs' challenge was that the frank,

> "in essence ... provides an unconstitutional 'subsidy' to incumbent candidates for Congress because franked mail inevitably has the effect of aiding Members' reelection efforts. Plaintiffs reason that because they are not afforded similar campaign advantages [the franking statute] abridges their First Amendment rights to associate freely for the advancement of political beliefs, as well as deprives them of equal protection under the due process clause of the Fifth Amendment."

574 F.Supp. at 673. The three judge court rejected plaintiffs' claims. The *Common Cause* court reached this result after having received extensive fact submissions on the basis of discovery conducted by the litigants. 574 F.Supp. at 681. Thus, this challenge was fully heard and decided upon its merits.

The decision of the District of Columbia panel affirmed by the Supreme Court brings to mind the Supreme Court's admonition that a "heavy presumption of constitutionality" attaches to the " 'carefully considered decision[s] of a coequal and representative branch of our government.' " *Department of Labor v. Triplett*, 494 U.S. 715, 721, 110 S.Ct. 1428, 1432, 108 L.Ed.2d 701 (1990). In this case, this presumption is exponentially strengthened by the claim having been previously fully adjudicated.

Moreover, it must again be noted that plaintiffs have not claimed that the rules governing the use of the frank have been violated. What they claim is that the rules themselves are unconstitutional.[12] Thus, in the absence of such a claim of abuse of the franking statute, it follows that "[t]he conceded and undisputed legitimate interests [namely, consistent communication between citizens and their elected representatives] promoted by the franking statute are sufficient to justify the limited impacts on the rights of [the plaintiffs]." *Common Cause*, 574 F.Supp. at 683.

In light of the foregoing, this Court is driven to conclude that the plaintiffs can prove no set of facts in support of their claim against the franking statute which would entitle them to the relief they seek. Thus, this last aspect of plaintiffs' case must be dismissed.

*CONCLUSION*

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. at 17, 84 S.Ct. at 535. The integrity of the process by which one exercises that precious right is inseparable from the right itself. To the extent that the plaintiffs believe that a modification of the process would enhance its integrity, they must make the case for the validity of that belief with the political branches of our government. For just as fundamental to the political order of this democracy is the doctrine of separation of powers and the limited jurisdiction conferred upon the federal judiciary within that political order. *See The Federalist*, Nos. 47, 80. That jurisdiction is limited by principles of standing and by the wise exercise of restraint and self-discipline in resisting invitations to resolve political questions.

For the foregoing reasons, defendants' motions to dismiss the complaint are granted.

SO ORDERED.

---

**12.** At oral argument, plaintiffs' counsel stated that the problem with the statute, in their eyes, is that "the statute doesn't define what we see as abuse as abuses at all." Transcript at 35. Presumably, this is why plaintiffs have not brought their claims before the franking commission as provided for in 2 U.S.C. § 501.